## In re EMERGENCY BEACON CORP., Debtor.

**Bankruptcy Nos. 76 B 356, 77 B 980.**

United States District Court,
S.D. New York.

April 12, 1985.

As Amended April 16, 1985.

Harvey S. Barr, Spring Valley, N.Y., for trustee.

Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, for Montmartco, Inc.; Laurence J. Kaiser, and Karen M. Klein, New York City, of counsel.

Stephen G. Glatzer, New Rochelle, N.Y., pro se.

## DECISION ON OBJECTION TO CLAIM

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The erstwhile trustee in possession of a confirmed Chapter XI debtor, Emergency Beacon Corp., has objected to the single largest unsubordinated unsecured claim filed against the estate by Montco, Inc. (now known as Montmartco and hereinafter referred to as Montco) in the amount of $217,363.75.[1] The trustee objects to the claim on the factual allegations that the debtor did not receive $80,000 of loan proceeds which form the basis of Montco's claim and that certain collateral was taken from Emergency Beacon without a proper credit being applied to the outstanding debt. Additionally, the trustee asserts that under Article 9 of the Uniform Commercial Code, Montco's claim was implicitly satisfied in whole or in part by the turnover of other collateral to this creditor. A further legal theory advanced by the trustee is that Montco's claim must be reduced to the extent that it is secured by stock of the debtor pledged by a third-party. Finally, the trustee seeks credit for a settlement payment received by Montco in connection with collateral litigation. Montco objects to the court's consideration of the settlement funds as excluded by the collateral source rule and moves for sanctions against the trustee for raising allegedly frivolous objections to Montco's claim.

### FINDINGS OF FACT

1. Emergency Beacon Corp. originally filed a Chapter XI petition under the now repealed Bankruptcy Act of 1898, as amended, on February 18, 1976.

2. The Chapter XI case was aborted on March 11, 1977 with the result that Harvey S. Barr was appointed the trustee in bankruptcy.

3. Thereafter, new management of the corporate debtor reinstated the Chapter XI case with the court's consent. Harvey S. Barr continued as the trustee in possession in the reinstated Chapter XI case.

4. On March 30, 1984, an order was entered by the court confirming a Chapter XI plan proposing to pay unsecured creditors 10.5% of their allowed claims over a seven year period together with shares of stock of the debtor, entitling them to receive 5% of the debtor's annual gross income, until a 100% distribution is achieved.

5. Prior to the filing of the Chapter XI petition, Rocco Scappatura, who was then the president of Emergency Beacon Corp., approached George Horvath, president of Montco, Inc., for the purpose of obtaining a loan from Montco.

6. On March 13, 1975, the board of directors of the debtor adopted a resolution authorizing the debtor to borrow $145,000 from Montco for a period of approximately 90 days at a 20% interest rate and to pledge as security for the loan its accounts receivable, inventory, test equipment, real property and other assets of the company.

7. On March 26, 1975, the debtor entered into a written loan and security agreement whereby Montco agreed to advance the debtor $145,000 for 90 days at an interest rate of 20% for which Montco received a security interest in all of the debtor's present and future contract rights and their proceeds, the debtor's physical assets including its machinery, furniture, fixtures and equipment and the debtor's inventory including raw materials. The agreement also referred to a mortgage in the face amount of $70,000 given by the debtor on certain real estate as additional security for the loan.

8. The $145,000 advance to Emergency Beacon consisted of two components. One check made payable to Emergency Beacon Corp. in the amount of $65,000 was delivered directly to the debtor as part of the

---

1. The parties have apparently agreed to a downward adjustment of Montco's claim to the extent of $70,000. The trustee has paid this amount into an escrow fund in settlement of a mortgage foreclosure action brought by Montco against the debtor's New Rochelle realty. Upon the release of the $70,000, the estate would be entitled to a corresponding credit in the form of reduction of Montco's claim.

loan transaction. Pursuant to a written agreement,[2] the balance of the loan, $80,-000,[3] was advanced in the form of a check issued to Jack B. Polish who was the attorney representing Emergency Beacon at that time. Polish deposited this check into a special account at Merchants Bank of New York and subsequently drew a check in the same amount made payable to himself which he endorsed and delivered to the National Bank of Westchester ("NBW"). The purpose of the $80,000 payment to NBW was to satisfy Emergency Beacon's outstanding obligation to the bank, which was secured by a lien on the same assets that Emergency Beacon had pledged to Montco, and to receive a release of the collateral from NBW. Polish then obtained releases of the security interests held by NBW which he subsequently caused to be recorded.

9. The debtor's Statement of Affairs attached to its original Chapter 11 petition reflects that a loan for $80,000 made by NBW was repaid. NBW has never asserted a secured claim in this Chapter 11 case based on this loan and security agreement.

10. Mr. Polish testified that he was named as the payee on the check which he subsequently endorsed over to NBW because he was unsure as to whether the transaction would be completed and that the secured assets would be released. Under the written agreement between Montco and Emergency Beacon, the $80,000 portion of the loan would revert to Montco if NBW were not paid its indebtedness.

11. On May 29, 1975, Emergency Beacon's board of directors adopted a second resolution authorizing the debtor to borrow an additional $105,000 from Montco and to pledge the same security.

12. On May 30, 1975, the parties amended the preexisting security agreement to reflect the additional advance of $105,000, making the total indebtedness $250,000, and to raise the interest rate to 24%. This interest rate was demanded by George Horvath, the president of Montco, because in order to make the loan, he had to withdraw Montco funds from the Chase Manhattan Bank where it was earning 18% interest.

13. On August 13, 1975, the debtor borrowed an additional $25,000 from Montco, with interest at the rate of 24% per annum, as evidenced by a promissory demand note dated that same day. The debtor sought this advance because its corporate account at Westchester Savings Bank had been seized by the bank and unless an obligation owed to the bank was satisfied, Emergency Beacon's outstanding checks issued from this account would not clear. Once the loan proceeds were obtained, they were deposited at Westchester Savings Bank.

14. As collateral for the loan made on August 13, 1975, Scappatura offered to grant Montco a security interest in an airplane and four automobiles owned by Emergency Beacon. Horvath indicated that these assets were insufficient security and Scappatura added his personal guarantee of the loan to his offer of collateral. Horvath requested further security for

2. The written agreement is in the form of a letter from Montco to Jack Polish, Esq., dated March 26, 1975. Emergency Beacon Corp., by its then president Rocco Scappatura, noted its consent to the agreement at the foot of the letter which describes the relevant terms of the loan as follows:

We have on this date drawn a check in the amount of $80,000 payable to your order as attorney that such funds will be used and applied to the extent necessary to discharge the loan obligation held by the National Bank of Westchester to your client and obtain a termination statement of the security interest held by the National Bank of Westchester relating to accounts receivable, inventory and fixtures, that

such funds would be released only at such time as you are in receipt of such termination statement. In the event the termination statement is not obtained by you within thirty (30) days from the date hereof than [sic] you will return the aforementioned $80,000 to Montco Inc. and the same shall constitute a reduction in the amount of the outstanding principal balance of the debt. You will cause the filing of the termination statement with the appropriate filing officers at the sole cost and expense of your client.

3. The face amount of the check is $79,929.58. The difference of $70.42 was not explained by Mr. Polish and Emergency Beacon is undisputedly entitled to a credit for this amount.

Scappatura's personal guarantee because he felt that Scappatura "was not good for it." At this point, Scappatura offered 43,659 shares of his stock in Emergency Beacon Corporation as collateral for his guarantee. Horvath accepted this pledge of Scappatura's stock along with Scappatura's personal guarantee and the security interest in the debtor's airplane and vehicles.

15. In August, 1977, after the reinstatement of the Chapter XI case, on the heels of the qualification of a trustee in bankruptcy, Montco commenced an action in state court to foreclose upon its security. Thereafter, pursuant to an order of this court, the trustee in possession turned over to Montco all of the debtor's inventory, furniture, fixtures and equipment for sale at a public auction conducted on behalf of the secured creditor. After a deficiency claim of approximately $200,000 resulted from the sale, Montco asserted a further interest in the debtor's patent rights, tradename, customer lists, books and records and the right to manufacture or sell emergency beacons, the debtor's product. Montco urged that its security interest covered these assets of the debtor.

16. Pursuant to an opinion and order dated December 28, 1977, this court ruled that the debtor's patent rights, tradename, customer lists, books and records and right to manufacture and sell its products were general intangibles within the meaning of § 9–106 of the Uniform Commercial Code and that they did not fall within the category of "goods" or "things" as those terms were used in Montco's security agreement. Montco's asserted security interest in these items was thereby rejected. *In re Emergency Beacon Corp.*, 23 U.C.C.Rep.Serv. (Callaghan) 766, 772 (Bkrtcy.S.D.N.Y.1977), *aff'd*, 78 Civ. 795, (S.D.N.Y. September 22, 1978) (mem.).

17. In June of 1978, Emergency Beacon turned over to Montco that portion of Montco's collateral consisting of accounts receivable. These accounts were produced almost exclusively by sales of HAM and CB radios manufactured by Emergency Beacon which did not perform to the level of expectation of the dealers who purchased the radios. Prior to turning over the accounts receivable to Montco, Emergency Beacon's trustee attempted without success to collect from the account debtors, many of whom had discontinued their business relationships with Emergency Beacon. The trustee's collection efforts were met by a raft of letters complaining either that the radios were defective or that they were never actually purchased, but merely consigned.

18. The trustee testified that despite his initial difficulties in collecting the accounts receivable, he could have turned them over for collection and could have received $14,000 to $16,000 in net gain for the estate. Following the turnover, Montco's collection effort produced $650 in payments received at an expense of over $1000, resulting in approximately $350 of losses to the secured creditor.

19. There was no evidence presented that Montco expressed an intention, either orally or in writing, to accept the accounts receivable in full or partial satisfaction of its claim against Emergency Beacon.

20. In addition to the accounts receivable that were turned over to Montco, Emergency Beacon lost possession of a Bolex camera and Angenioux lens valued at approximately $3000. Stephen Glatzer, the president and principal shareholder of the debtor, stated that the camera and lens were received by Rocco Scappatura, the former president and a director of Emergency Beacon. However, there was no evidence adduced that Montco, its representatives, or an auctioneer acting on its behalf ever came into possession of this personal property or that Montco was involved in its disposition. Since this occurrence there has been no account made for the camera and lens nor has the estate been given credit by Montco for their estimated value.

21. In July, 1981, Montco commenced an action in the Supreme Court of the State of New York, County of New York, against the law firm of Weiss, Rosenthal, Heller & Schwartzman ("Weiss, Rosenthal"), the attorneys who prepared the security agree-

ment between Montco and Emergency Beacon Corp. In its Second Amended Complaint, dated June 7, 1982, Montco alleged that Weiss, Rosenthal's negligence in failing to encompass general intangibles within the scope of the security interest caused Montco damages of $367,999.75 plus interest and further attorney's fees. Paragraph "Tenth" of the Second Amended Complaint states:

Solely by reason of defendant's negligence, plaintiff did not obtain a security in Emergency Beacon's patent rights, trade name, customer lists and books and records, and therefore, was not able to manufacture and sell emergency beacons, despite Emergency Beacon's default, as a result of which plaintiff has been damaged in the sum of $275,000 of which sum plaintiff has received on account of principal, the sum of $57,000 leaving the sum of $218,000 due and owing to plaintiff, together with attorneys' fees and accountants' fees of $40,000 incurred in connection with plaintiff's efforts to foreclose on the collateral security, together with additional attorneys' fees and related expenses incurred by plaintiff since the commencement of this action as a result of the negligence of defendant in the amount of $109,999.75 for a total of $367,999.75 together with interest from November 1, 1977 and for such additional sums for attorneys' fees and related expenses as may be incurred subsequent to the date of this Second Amended Complaint and as may be proved at the trial of this action.

It appears from the above-quoted allegation that Montco sued for the principal amount of $218,000 which comprised the unpaid portion of the $275,000 aggregate loans made by Montco. Added to this figure of $218,000 were interest, attorney's fees, accountant's fees and expenses allegedly incurred in connection with efforts to foreclose on the collateral and the subsequent negligence action against Weiss, Rosenthal.

22. Montco settled its action against Weiss, Rosenthal for $95,000, but did not assign to Weiss, Rosenthal its claim against Emergency Beacon. The parties exchanged general releases in consummating the settlement.

23. Montco has filed a proof of claim for $217,363.75 against Emergency Beacon in this Chapter XI proceeding. The trustee of Emergency Beacon objects to and seeks to expunge this claim.

## DISCUSSION

### RETENTION OF COLLATERAL

*Accounts Receivable*

The trustee of Emergency Beacon objects to a portion of Montco's claim because the trustee "delivered viable accounts receivable to the creditor on June 9, 1978 which accounts receivable totalled the sum of $35,354.10. Accordingly, the claimant has received payment of the sum of $35,354.10."

In his memorandum, the trustee urges that the turnover of accounts receivable constituted an implied satisfaction of the entire debt owed to the secured creditor. The weight of authority in New York refutes this position. In the absence of a written notice to the debtor expressing an election to accept collateral in full satisfaction of an obligation, none will be implied under U.C.C. § 9–505(2). *Hanam, B.V. v. Kittay*, 589 F.Supp. 1042, 1048 (S.D.N.Y. 1984); *Szelega v. Farega Realty Corp.*, 97 A.D.2d 874, 469 N.Y.S.2d 271 (3rd Dep't 1983); *Chrysler Credit Corp. v. Mitchell*, 94 A.D.2d 971, 464 N.Y.S.2d 96 (4th Dep't 1983) (per curiam); *Marine Midland Bank v. Connelly*, 79 A.D.2d 1102, 435 N.Y.S.2d 850 (4th Dep't 1981); *S.M. Flickinger Company, Inc. v. 18 Genessee Corp.*, 71 A.D.2d 382, 385, 423 N.Y.S.2d 73, 76 (4th Dep't 1979). *Contra Northern Financial Corporation v. Chatwood Coffee Shop, Inc.*, 4 U.C.C.Rep.Serv. (Callaghan) 674 (N.Y.Sup.Ct.1967).

As an additional argument, the trustee states in his objection that by virtue of the surrender of collateral, "the claimant has received payment of $35,354.10." This

conclusion is a non sequitur. It should be recognized that the trustee's own testimony limits the amount by which Montco's claim might be reduced on these grounds to $16,000, which is the maximum value ascribed to the accounts receivable by the trustee. Moreover, the turnover of the accounts receivable to Montco under these circumstances is not the equivalent of payment to Montco of an amount equal to the trustee's estimated value of the accounts.

■ This court has previously noted that by filing an unsecured claim in a bankruptcy proceeding, an undersecured creditor may establish a deficiency against the debtor "just as though there were no bankruptcy proceeding." *In re Winer*, 39 B.R. 504, 508 (Bkrtcy.S.D.N.Y.1984), *aff'd*, No. 84 Civ. 5499 (S.D.N.Y. February 6, 1985) (mem.). If the debtor has a valid defense to the deficiency claim under state law, section 502(b)(1) of the Bankruptcy Code allows the defense to be asserted in the bankruptcy forum. The rights of the parties who dispute the amount of Montco's deficiency claim in this case are governed by the provisions in the Uniform Commercial Code ("U.C.C.") dealing with the disposition of collateral by a secured party.

Under Article 9 of the U.C.C., a secured party has the right upon default to take possession of the collateral. N.Y.U.C.C. § 9–503 (McKinney 1964). Where the secured creditor exercises its right to take possession upon default, it must treat the collateral in conformance with the requirements of Article 9. *S.M. Flickinger Company, Inc. v. 18 Genessee Corp.*, 71 A.D.2d at 383, 423 N.Y.S.2d at 75. The rules that apply to the disposition of collateral, contained in U.C.C. § 9–504, are as follows: Subsection (1) authorizes the secured creditor to liquidate the collateral and apply the proceeds to the unpaid balance of the debt; subsection (2) states that the debtor remains liable for any deficiency; and, subsection (3) allows the creditor to dispose of the collateral by public or private proceedings so long as every aspect of the disposition is "commercially reasonable."

The trustee in this case challenges Montco's collection process as a commercially unreasonable disposition, thereby imposing upon the secured creditor the affirmative burden of proving the commercial reasonableness of a disposition of collateral which results in a deficiency. *See, e.g., First National Bank v. G.F. Clear, Inc.*, 93 A.D.2d 925, 926, 462 N.Y.S.2d 327, 329 (3rd Dep't 1983); *General Electric Credit Corp. v. Durante Bros. & Sons*, 79 A.D.2d 509, 510, 433 N.Y.S.2d 574, 576 (1st Dep't 1980); *Security Trust Co. v. Thomas*, 59 A.D.2d 242, 247, 399 N.Y.S.2d 511, 514 (4th Dep't 1977); *Bankers Trust Co. v. Steenburn*, 95 Misc.2d 967, 982, 409 N.Y.S.2d 51, 60–61 (Sup.Ct.1978), *aff'd*, 70 A.D.2d 786, 418 N.Y.S.2d 723 (4th Dep't 1979) (mem.).

■ There is no mandate under U.C.C. § 9–504 that a secured creditor conduct a sale of collateral following a default; all that is required is a commercially reasonable disposition of the collateral. Section 9–504 states in pertinent part:

(1) A secured party after default may sell, lease *or otherwise dispose of* any or all of the collateral....

\* \* \* \* \* \*

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale *or other disposition* may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

N.Y.U.C.C. § 9–504(1), (3) (McKinney Supp. 1984–1985) (emphasis added). Similarly, section 9–502(2) states in part:

A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors *must proceed in a commercially reasonable manner* and may deduct his reasonable expenses of realization from the collections.

N.Y.U.C.C. § 9–502(2) (McKinney Supp. 1984–1985) (emphasis added).

The question raised here is whether Montco made a commercially reasonable disposition of the accounts receivable which it received from the debtor. The wide discrepancy between the $650 actually received from collections and the $16,000 top estimated value of the receivables signals a need for close scrutiny of Montco's disposition. *See In re Zsa Zsa Limited,* 352 F.Supp. 665, 671 (S.D.N.Y.1972), *aff'd,* 475 F.2d 1393 (2d Cir.1973) (mem.). However, a seemingly low return is usually not dispositive of the issue of commercial reasonableness. *Id.*

The official comment to U.C.C. § 9–507 imposes a condition of good faith upon the creditor acting to protect its rights under Article 9. Thus, the creditor must act to protect not only its interests, but the debtor's interests as well. *Connex Press, Inc. v. International Airmotive, Inc.,* 436 F.Supp. 51, 56 (D.D.C.1977), *aff'd,* 574 F.2d 636 (D.C.Cir.1978); *cf.* U.C.C. § 9–502 official comment 2 (debtor and creditors have a right that the secured party "not dump the accounts receivable for purpose of increasing deficiency"). The evidence in this case does not reveal imprudence or a lack of good faith on Montco's behalf which would warrant a finding of commercial unreasonableness. Montco acquired possession of distressed accounts receivable which were disputed on the grounds that the goods were delivered on a consignment basis only, subject to return, or that they were defective. The worthless state of this security was brought to light by the fact that Montco's expenses incurred in reducing the receivables to cash exceeded the amount collected. Indeed, the Chapter XI trustee's decision to turn over the accounts receivable may have been in contemplation of such a low return. Montco, as a creditor who originally accepted this collateral to improve its position vis-a-vis Emergency Beacon and its other creditors, should not be denied any of its deficiency claim as a result of its unsuccessful attempt to liquidate distressed accounts receivable which would have yielded no more under the auspices of the trustee. The trustee's prior efforts to collect these receivables before they were turned over to Montco were concededly unproductive. Montco should not be faulted for being unable to turn vinegar into wine. Unlike good wine, stale receivables do not improve with age.

### THE $95,000 SETTLEMENT

Emergency Beacon's trustee has applied for a credit of $95,000 against Montco's claim, which represents the sum that Montco received in settlement of its lawsuit against Weiss, Rosenthal which alleged negligence and breach of contract. The trustee reasons that unless Montco's claim is reduced by the settlement amount, Montco will be the undeserving beneficiary of a double recovery, to the detriment of the estate. The first line of defense raised to this claim consists of the "collateral source" doctrine which, Montco contends, precludes the consideration of third-party settlement funds in determining the proper amount of Emergency Beacon's liability.

The courts of New York adhere to the universally accepted rule that a harmed plaintiff must take reasonable steps to minimize losses or mitigate damages. *Air el Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir.1985); *Wilmot v. State,* 32 N.Y.2d 164, 168–69, 297 N.E.2d 90, 92, 344 N.Y.S.2d 350, 352–53 (1973); *Cornell v. T.V. Development Corp.,* 17 N.Y.2d 69, 74, 215 N.E.2d 349, 352, 268 N.Y.S.2d 29, 33 (1966). The duty to mitigate extends not only to actions which should have been taken before the injury, but also to actions taken post-injury. *See Alberti v. New York, L.E. & W.R. Co.,* 118 N.Y. 77, 83, 23 N.E. 35, 36 (1889); *Murphy v. John Hofman Co.,* 177 A.D. 380, 381, 163 N.Y.S. 932, 933 (3rd Dep't 1917), *aff'd,* 224 N.Y. 630, 121 N.E. 880 (1918) (mem.).

Upon discovering that certain general intangibles were not subject to its security agreement with Emergency Beacon, Montco commenced an action against Weiss, Rosenthal for breach of contract, negligence

in preparing the security interest and various incidental damages, including accountant's fees, interest, and attorney's fees and expenses incurred prior and subsequent to the litigation against Weiss, Rosenthal. The trustee characterizes the pursuit of this cause of action as a reasonable attempt to mitigate losses incurred in the collection of the secured loan. Therefore, the trustee concludes, the $95,000 settlement sum should be credited in mitigation of Montco's claim against the estate.

In general, the collateral source rule operates to exclude evidence of the receipt of partial or total compensation to a plaintiff made by a source wholly independent of and collateral to the wrongdoer. *E.g.*, *Rutzen v. Monroe County Long Term Care Program, Inc.*, 104 Misc.2d 1000, 1001, 429 N.Y.S.2d 863, 864 (Sup.Ct. 1980). Thus, damages against a defendant are not mitigated or reduced by payments received from an unrelated third party. *Healy v. Rennert*, 9 N.Y.2d 202, 206, 173 N.E.2d 777, 778, 213 N.Y.S.2d 44, 46–47 (1961); *Seward v. Northrup*, 123 Misc.2d 420, 422, 473 N.Y.S.2d 754, 756 (Sup.Ct. 1984). This doctrine applies to cases in tort as well as contract. *Gusikoff v. Republic Storage Co., Inc.*, 241 A.D. 889, 272 N.Y.S. 77 (2nd Dep't 1934); *Clarke v. Fidelity & Casualty Co.*, 55 Misc.2d 327, 285 N.Y.S.2d 503 (Sup.Ct.1967).

The policy for the collateral source doctrine is best explained as a desire to have issues decided on their merits, and that injecting evidence of third party reimbursement, typically some form of insurance or indemnity, is repugnant to the concept of a fair trial. *Halladay v. Verschoor*, 381 F.2d 100, 112 (8th Cir.1967). However, the collateral source rule has been severely restricted in its application by the courts. *Klein v. United States*, 339 F.2d 512, 517–18 (2d Cir.1964); *Tinnerholm v. Parke Davis & Co.*, 285 F.Supp. 432, 453 (S.D.N.Y. 1968), *aff'd*, 411 F.2d 48 (2d Cir.1969). In New York, the doctrine has been limited to collateral payments from disability compensation, pension funds, retirement allowance or insurance which is procured by the injured party. *Szybura v. City of Elmira*, 28 A.D.2d 1154, 1155, 284 N.Y.S.2d 190, 192 (3rd Dep't 1967). This restrictive application confines the effect of the collateral source exclusion to reward injured parties prudent enough to have procured insurance or indemnity of some sort to which the defendant did not contribute. *Seward v. Northrup*, 123 Misc.2d at 422, 473 N.Y.S.2d at 756; *see also Cunningham v. Rederiet Vindeggen A/S*, 333 F.2d 308, 316 (2d Cir.1964). "The theory is that it is unfair to require the insured to pay for his own injuries where he pays for the coverage." *Silinsky v. State-Wide Insurance Company*, 30 A.D.2d 1, 4, 289 N.Y.S.2d 541, 546 (2nd Dep't 1968).

Manifestly, Montco may not invoke the collateral source rule under the circumstances of this case where the collateral funds are not the result of indemnity or insurance for which Montco extended prior consideration. Each of the cases relied upon by Montco involves some form of indemnity, insurance or fund to which the plaintiff contributed, and hence is distinguishable. *Bank of Italy Nat. Trust & Savings Ass'n v. Farmers' & Merchants' Nat. Bank*, 44 F.2d 325 (9th Cir.1930) (surety bond); *Healy v. Rennert*, 9 N.Y.2d 202, 173 N.E.2d 777, 213 N.Y.S.2d 44 (pension plan payments); *Gusikoff v. Republic Storage Co., Inc.*, 241 A.D. 889, 272 N.Y.S. 77 (insurance proceeds); *Carney v. Morrison*, 223 A.D. 244, 228 N.Y.S. 308 (1st Dep't 1928) (title insurance); *Rutzen v. Monroe County*, 104 Misc.2d 1000, 429 N.Y.S.2d 863 (unemployment compensation); *Veverka v. Spinella*, 60 Misc.2d 529, 303 N.Y.S.2d 305 (Sup.Ct.1969) (insurance proceeds).

Had Montco obtained the $95,000 pursuant to a legal malpractice insurance policy for which it paid premiums, application of the collateral source rule may well have been appropriate. However, the settlement proceeds are not attributable to a stranger or source wholly independent of the principal defendant. The Weiss, Rosenthal firm is a related party as a result of its failure to incorporate general intangibles in

Montco's security interest which caused a deficiency claim to arise to the extent of the value of these unencumbered assets. The collateral source doctrine does not apply to funds received from this related entity.

■ In its lawsuit against Weiss, Rosenthal, Montco sued for incidental and consequential damages of over $150,000 in addition to its principal claim for $217,363.75. Montco did not assign its cause of action to Weiss, Rosenthal, but only granted a general release to the law firm. Emergency Beacon's trustee argues that the $95,000 settlement amount made Montco whole to this extent of its claim and that the failure to reduce Montco's claim against the debtor by $95,000 would result in the recovery of double damages. This argument, however, elides the incidental and consequential costs in excess of $150,000 which Montco incurred in its attempt to collect on its loan with Emergency Beacon. Settlement of the action may indeed have been intended to compensate Montco for these incidental costs. As the principal obligor on the debt owed to Montco, it was incumbent upon Emergency Beacon, acting through its trustee, to prove affirmatively that collateral funds, received from a third-party in exchange for a release, were paid in partial satisfaction of the outstanding loan obligation owed by Emergency Beacon. *Cf. Silinsky v. State-Wide Insurance Company*, 30 A.D.2d at 5, 289 N.Y.S.2d at 547 (obligor who remains liable has burden to prove that third-party settlement funds reimburse plaintiff for all damages sustained). The trustee has failed to satisfy this burden.

■ There is an additional reason to permit Montco to apply the $95,000 it received from Weiss, Rosenthal towards its incidental damages insofar as these proceeds relate to legal expenses. Under a commonly recognized exception to the general American rule governing the award of attorney's fees, a successful litigant may recover legal expenses that are reasonably incurred where a breach of contract causes a plaintiff to maintain a suit against a third party. *Artvale, Inc. v. Rugby Fabrics Corp.*, 232 F.Supp. 814, 826 (S.D.N.Y.1964), *aff'd*, 363 F.2d 1002 (2d Cir.1966); *Central Trust Co. v. Goldman*, 70 A.D.2d 767, 417 N.Y.S.2d 359 (4th Dep't), *appeal dismissed*, 47 N.Y.2d 1008, 394 N.E.2d 290, 420 N.Y.S.2d 221 (1979); *Fugazy Travel Bureau, Inc. v. Ernst & Ernst*, 31 A.D.2d 924, 298 N.Y.S.2d 519 (1st Dep't 1969). In *Shindler v. Lamb*, the court stated the rule as follows:

> If, through the wrongful act of his present adversary, a person is involved in earlier litigation with a third person in bringing or defending an action to protect his interests, he is entitled to recover the reasonable value of attorneys' fees and other expenses thereby suffered or incurred (*Jones v. Morgan*, 90 N.Y. 4; *Hynes v. Patterson*, 95 N.Y. 1; *Boyles v. Burnett*, 213 Mo.App. 288 [249 S.W. 719 (1923)]; *Turner v. Zip Motors*, 245 Iowa 1091 [65 N.W.2d 427 (1965)]; *Ritter v. Ritter*, 381 Ill. 549 [46 N.E.2d 41 (1943)]; see, also, Ann. 45 A.L.R.2d 1183–1198; 25 C.J.S., Damages, § 50, subd. c; 15 Am.Jur., Damages, § 144; Restatement, Torts, § 914).

25 Misc.2d 810, 812, 211 N.Y.S.2d 762, 765 (Sup.Ct.1959), *aff'd*, 10 A.D.2d 826, 200 N.Y.S.2d 346 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 621, 172 N.E.2d 79, 210 N.Y.S.2d 226 (1961) (mem.). The attorney's fees and expenses incurred by Montco as a result of its not being fully secured were set forth in its complaint as damages against Weiss, Rosenthal, and fall squarely within this exception. Such fees and expenses were the consequence of Emergency Beacon's breach of its loan obligation and the subsequent determination that the security agreement prepared by Weiss, Rosenthal was defective.

The evidence in this case reveals a blanket settlement figure of $95,000, based upon a damage claim of $218,000 for moneys advanced and $109,000 for expenses and attorney's fees that were incurred. Thus, the size of either damage item exceeds the settlement figure. There was no proof as to which item the $95,000 settle-

352

ment related. It was incumbent upon the trustee to establish how much of the settlement was solely attributable to the Montco loan to Emergency Beacon. *See Silinsky v. State-Wide Insurance Co.*, 30 A.D.2d at 5, 289 N.Y.S.2d at 547. The trustee failed to sustain this burden of proof and may not now be heard to say that the entire blanket settlement sum of $95,000 should reduce Montco's principal claim.

### EMERGENCY BEACON STOCK

■ The trustee seeks further reduction of the Montco claim in the form of a credit for the value of 43,659 shares of Emergency Beacon stock pledged as security for Scappatura's personal guarantee. This request must be denied for the simple reason that the stock was neither owned nor pledged by Emergency Beacon, the principal debtor on the obligation which underlies this security. When Scappatura gave his personal guarantee, secured by the shares of stock, he became a surety for the Emergency Beacon obligation. *See Epstein v. Goldstein*, 118 F.2d 73 (2d Cir. 1941). Montco, a creditor of Emergency Beacon holding collateral securing a third-party guarantee, was neither under an obligation to liquidate the collateral nor to collect from the guarantor. The fundamental principle governing these relationships was stated in *Anderson v. Massachusetts Mutual Life Insurance Co.*, 101 Misc.2d 582, 583, 421 N.Y.S.2d 539, 540 (Sup.Ct.1979), *modified*, 77 A.D.2d 248, 432 N.Y.S.2d 959 (4th Dep't 1980), as follows:

It is a principle of common law that a security interest made for the benefit of the secured party may be released by him at his pleasure. "It is elementary that a creditor, having in his actual possession one or two sorts of security, is not obliged to resort to either, but may collect through execution on a judgment on the debt itself; and turn about, he is not obliged to resort to his action, but may rely on either of his securities" (*Matter of Vicinus*, 159 Misc 903, 908 [290 N.Y.S. 20 (N.Y.Sur.1936)]; see, also, *Kennedy v. Strobel*, 77 Hun 96 [28

N.Y.S. 452]; 53 NY Jur, Secured Transactions, § 248).

*See also* 54 N.Y.Jur. *Secured Transactions* § 263, at 26 (1967) (secured creditor may seek to collect on debt without regard to security).

It is discernible from the suretyship arrangement that only the surety and creditor have proprietary interests in the pledged stock; the debtor has no colorable interest in the asset securing the surety's obligation. *Cf. Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962) (bankruptcy trustee lacked interest in fund created by surety for purpose of paying debtor's laborers and materialmen); *Kelce v. U.S. Financial Incorporated (In re U.S. Financial Incorporated)*, 648 F.2d 515, 518 (9th Cir.1980). That Scappatura's pledge consisted of shares of Emergency Beacon stock as opposed to stock in any other corporation has no bearing on the trustee's proprietary interest in the pledged stock, which is wholly lacking.

■ Additionally, it is settled law that a creditor, secured by property of a third party, may assert the full amount of its claim against the debtor's estate without deduction for the security. *Reconstruction Finance Corp. v. Denver & Rio Grande Western Railroad Co.*, 328 U.S. 495, 529, 66 S.Ct. 1282, 1300, 90 L.Ed. 1400 (1946); *Ivanhoe Building & Loan Association v. Orr*, 295 U.S. 243, 245–46, 55 S.Ct. 685, 686, 79 L.Ed. 1419 (1935); *Prudence Realization Corp. v. Prudence-Bonds Corp.*, 189 F.2d 931, 936 (2d Cir.1951), *aff'd*, 198 F.2d 19 (2d Cir.1952) (per curiam); *St. Louis Union Trust Co. v. Jolliffe*, 74 F.2d 247, 249 (2d Cir.1934); *In re Cigar Stores Co. of America*, 73 F.2d 296, 297 (2d Cir.1934), *cert. denied sub nom. Irving Trust Co. v. Bankers Trust Co.*, 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935); *Swarts v. Fourth National Bank*, 117 Fed. 1, 17 (8th Cir.1902). This is true because section 1(28) of the Bankruptcy Act of 1898 defines a secured creditor as

a creditor who has security for his debt *upon the property of the bankrupt* of a

nature to be assignable under this Act or who owns such a debt for which some endorser, surety, or other person secondarily liable for the bankrupt has such security upon the bankrupt's assets.

(emphasis added). *Accord In re Santoro Excavating, Inc.,* 32 B.R. 947, 948, 10 B.C.D. 1369, 1370 (Bkrtcy.S.D.N.Y.1983) ("A lien on property of another does not give rise to a secured claim against the debtor's estate."). In view of the status of Montco's claim as unsecured vis-a-vis the debtor's estate, there is no reason to reduce the claim by the value of the Scappatura-owned stock. Accordingly, the trustee's objection seeking credit for the value of the Emergency Beacon stock pledged by Scappatura is without merit.[4]

## MISSING COLLATERAL

█ The trustee has argued for a credit against Montco's claim for the value of a Bolex camera and Angenieoux lens of which Emergency Beacon lost possession. However, the record reveals no evidence to the effect that Montco, its representatives or an auctioneer employed to liquidate certain collateral ever obtained possession of these items. Having failed to connect Montco with the disappearance of the camera and lens, the trustee cannot succeed on this aspect of his objection.

## THE BIFURCATED LOAN

█ The trustee asserts in a supplemental objection to Montco's claim that $80,000 of the $145,000 advance made to Emergency Beacon on March 26, 1975 was never received by the corporation, but was delivered instead to a third party who was unrelated to the debtor. Any question that

the trustee may have raised on these grounds, however, became a non-issue when Montco caused the cancelled $80,000 check to be produced before trial. Upon inspection of the check, it was evident that Jack Polish, Emergency Beacon's lawyer at that time, endorsed the check issued by Montco and delivered it to NBW in satisfaction of NBW's secured claim, as reflected on the debtor's Statement of Affairs attached to its Chapter XI petition. Satisfaction of this debt and the corresponding release of the underlying collateral were conditions imposed by Montco in connection with its $145,000 secured loan. It is clear that Emergency Beacon used $80,000 of the loan proceeds to satisfy its antecedent secured debt to NBW in accordance with Montco's requirements.[5] The trustee may not now be heard to say that Emergency Beacon did not receive this advance when it benefited from the satisfaction of its obligation to NBW.

## SANCTIONS

█ Montco is not content with the finding that its claim should not be reduced on the basis of the $80,000 payment to NBW, but further seeks to impose sanctions, including attorney's fees, on the trustee of Emergency Beacon for filing a purportedly groundless objection to the $80,000 portion of Montco's claim as described above. Montco contends that by filing and pursuing his objection, the trustee violated Bankruptcy Rule 9011(a), which provides in pertinent part:

> Every petition, pleading, motion and other paper served or filed in a case *under the Code* on behalf of a party

---

4. The trustee posits that retention of the Emergency Beacon stock constituted a strict foreclosure under U.C.C. § 9–505(2). This position is rejected for the same reason discussed *supra* in connection with the accounts receivable.

5. Stephen Glatzer, the current president of Emergency Beacon who was allowed to file a memorandum of law with the court as a subordinated creditor of the estate, vehemently disputes the description of the NBW transaction adduced from Mr. Polish's testimony. However, Mr. Glatzer was unable to produce at trial

any evidence to the court controverting the authenticity of Mr. Polish's check or the bona fides of the transaction. Needless to say, Mr. Glatzer's personal suspicion and distrust of the individuals involved in the payment of the NBW debt fall substantially shy of the high level of clear and convincing proof required to sustain the fraudulent scheme which he alleges. *See, e.g., Reno v. Bull,* 226 N.Y. 546, 124 N.E. 144 (1919); *Bernheimer v. Rindskopf,* 116 N.Y. 428, 22 N.E. 1074 (1889).

represented by an attorney ... shall be signed by at least one attorney of record.... The signature of an attorney or a party constitutes a certificate by him that he has read the document; that to the best of his knowledge, information, and belief formed after reasonable inquiry *it is well grounded in fact....* (emphasis added). However, rule 9011(a) has no applicability to this case for two reasons. First, the rule on its face is limited to legal documents "served or filed in a case under the Code." The "Code" refers to the Bankruptcy Reform Act of 1978 as indicated in the preface to the current Rules of Bankruptcy Procedure which became effective on August 1, 1983. Second, this court has previously noted that the recently promulgated Bankruptcy Rules do not apply to cases filed under the Bankruptcy Act of 1898. *See In re Silverman,* 36 B.R. 254, 257 (Bkrtcy.S.D.N.Y.1984).

Although Montco may not rely on Rule 9011 for sanctions in this Act case, it may look to the common law for support of an award of attorney's fees. Montco is indeed familiar with the imposition of sanctions, having been fined in the past by this court for making a frivolous motion to dismiss the "second" Chapter XI petition filed by Emergency Beacon. In an order dated February 11, 1981, this court dismissed the motion and granted judgment of $500 to the trustee as partial reimbursement of attorney's fees incurred in defense of the frivolous motion. More severe sanctions were imposed upon Montco in connection with other frivolous litigation emanating from these Chapter XI proceedings. *See In re Emergency Beacon Corp.,* 27 B.R. 757 (Bkrtcy.S.D.N.Y.1983).

The general American rule on the subject of awarding counsel fees is that the prevailing litigant is not entitled to collect an attorney's fee from the loser. *Railway Express Inc. v. Piper,* 447 U.S. 752, 765–66, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980); *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). One exception to this general principle permits an award of attorney's fees to a successful litigant "when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974); *see Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719 (1923). To sustain a claim for attorney's fees under this exception, there must be clear evidence that the claim advanced is entirely without color, lacking legal and factual support considered in light of the "reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980); *see Koppel v. Wien,* 743 F.2d 129, 135 (2d Cir.1984); *Browning Debenture Holders' Committee v. Dasa Corporation,* 560 F.2d 1078, 1088 (2d Cir.1977). Whether the trustee should be assessed attorney's fees based on the facts of this case must be determined according to these principles.

One week prior to the trial on the supplemental objection, the trustee received from Montco's attorneys a copy of the $80,000 check at issue. The original check was produced at trial pursuant to a subpoena. An indorsement on the check reflects that it was negotiated by Jack Polish to NBW, and the debtor's Statement of Affairs further indicates that NBW was paid its secured claim of $80,000 before Emergency Beacon filed its Chapter 11 petition. At this point the court asked the trustee whether he adhered to his objection, in view of the production of the check and in consideration of Montco's motion for sanctions. The trustee opted to adhere to his objection and questioned the authenticity of the check.

Although there did not appear to be any irregularities on the face of the check or with respect to the indorsement on the back of the check, it does not follow that the trustee should be faulted for putting Montco to its proof. The issue as to whether or not Montco had actually advanced the $80,000 in question was disput-

ed by the trustee since his appointment on March 11, 1977. An explanation was required as to why the transaction involved a check drawn by Jack Polish and payable to Jack Polish in order to prove that the debtor received the benefit of a transfer of like amount from Montco to NBW. Jack Polish's testimony at the trial was necessary to support this point. The trustee was entitled to cross examine Mr. Polish, especially since the check surfaced at this late stage in this case. Accordingly, the trustee did not act in bad faith, vexatiously, wantonly, or for oppressive reasons when he pursued this issue and, therefore, should not be assessed attorney's fees in favor of Montco.

 Montco also seeks sanctions in connection with the trustee's request for a credit of $6003 for the disappearance of the camera and lens owned by the estate. Montco is correct in its contention that the appraised value of $6003 relied upon by the trustee was contained in an appraisal report which was excluded from evidence on the grounds of hearsay and lack of authentication. The only evidence as to the value of these items was the trustee's testimony ascribing a value of $3000 to this photographic equipment. The court has rejected the trustee's claim on the merits and has not been misled by the erroneous valuation propounded in the trustee's memorandum of law. In this instance, the trustee's inability to construct effectively an accurate factual basis for his objection does not rise to the level of a "bad faith, vexatious or wanton" claim and does not warrant sanctions. *See F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. at 129, 94 S.Ct. at 2165.

 Similarly, the trustee's legal theory that Montco implicitly rendered its claim satisfied by virtue of its retention of Emergency Beacon's accounts receivable or the stock pledged by Scappatura should not be classified as specious. The trustee assumed a legally colorable position, relying on *Northern Financial Corporation v. Chatwood Coffee Shop, Inc.*, 4 U.C.C.Rep. Serv. (Callaghan) 674 (N.Y.Sup.Ct.1967).

This case, although representing a minority view in New York State, was neither reversed nor overruled by subsequent case law or statutory amendment. Additionally, the trustee relied upon authorities from other jurisdictions which amply support his legal theory. Proper disclosure of relevant adverse authority was made in accordance with Disciplinary Rule 7–102(A)(3) of the Model Code of Professional Responsibility and Rule 3.3(a)(3) of the Model Rules of Professional Conduct. The trustee's attempt to effect "an extension, modification or reversal of existing law," Model Code of Professional Responsibility DR 7–102(A)(2) (1980); Model Rules of Professional Conduct Rule 3.1 (1982), is expressly permitted by the rules of ethics. An award of attorney's fees would only serve to chill the types of good faith arguments authorized by these rules, which insulate the trustee from the imposition of sanctions. Finally, Montco is not entitled to an attorney's fee in defense of the trustee's claim for mitigation of damages which also presents a colorable legal issue.

## CONCLUSIONS OF LAW

1. Montco's acceptance of Emergency Beacon's accounts receivable did not constitute an implied satisfaction of Montco's claim under U.C.C. § 9–505(2).

2. Montco's treatment of the accounts receivable securing its claim against Emergency Beacon was commercially reasonable within the meaning of U.C.C. §§ 9–502(2) and 9–504(3).

3. The collateral source rule does not apply with regard to the $95,000 settlement proceeds received by Montco from the law firm of Weiss, Rosenthal, Heller & Schwartzman. These funds were obtained from a party related to the dispute between Montco and Emergency Beacon and did not result from prior consideration paid by Montco as required by the collateral source rule.

4. Notwithstanding the inapplicability of the collateral source doctrine to the $95,-000 settlement proceeds, the trustee did not

meet his burden to prove that these funds were paid towards the $217,363.75 principal amount owed on the defaulted loan. The settlement sum might have been applied towards Montco's incidental damages including the expenses of litigation incurred in its lawsuit against Weiss, Rosenthal which are otherwise recoverable under an exception to the general American rule regarding the recoverability of attorney's fees to a litigant. Accordingly, Montco's claim against the debtor is unaffected by receipt of the $95,000 settlement.

5. Emergency Beacon lacks any proprietary interest in the shares of stock pledged to secure the personal guarantee of its former president, Rocco Scappatura. Because the shares of stock are not property of the estate, Montco does not hold a secured claim against the estate which would require disallowance of its unsecured claim under former Bankruptcy Act section 57 h.

6. There is no basis for granting a credit to Emergency Beacon for the missing collateral consisting of a camera and lens worth $3000 in the absence of any evidence linking Montco to the disappearance of these items.

7. Emergency Beacon was the beneficiary of an $80,000 component of a bifurcated loan totalling $145,000 made by Montco on March 26, 1975. This advance was used to satisfy an antecedent secured debt to NBW and is rightfully asserted as part of Montco's claim, less $70.42 which was not paid to NBW.

8. Emergency Beacon's trustee's pursuit of his objection to the $80,000 bifurcated loan component was not factually groundless and does not justify an award of attorney's fees to Montco. The trustee's objections, including those based on implied strict foreclosure and offset for a purported secured claim, raise colorable legal issues and do not warrant the imposition of sanctions.

9. Montco's claim of $217,363.75 shall be reduced by $70.42 which sum was not received by Emergency Beacon as part of the $145,000 bifurcated loan. Additionally,

when the $70,000 foreclosure proceeds presently held in escrow are released to Montco, a proper adjustment of Montco's claim shall be made. The balance of Montco's claim, $147,293.33, shall remain as a valid, allowable claim against this confirmed Chapter XI debtor.

SETTLE ORDER on notice.