**JAMAICA COMMODITY TRADING COMPANY LIMITED, Plaintiff,**

v.

**CONNELL RICE & SUGAR CO., INC., Defendant.**

**No. 87 Civ. 3580.**

United States District Court, S.D. New York.

June 12, 1991.

As Amended June 18, 1991.

Law Offices of Mooney & Eagan, New York City, for plaintiff; Donald F. Mooney, Thomas M. Eagan, of counsel.

Healy & Baillie, New York City, for defendant; Raymond A. Connell, Andrew V. Buchsbaum, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff Jamaica Commodity Trading Company Limited ("JCTC") commenced this contract action on May 22, 1987 against defendant Connell Rice & Sugar, Inc. ("CRS") for damages totalling $123,-606.90 plus interest. JCTC alleges that sum constitutes the total of an award rendered on October 17, 1986 plus fees and

legal costs claimed to have arisen out of the related arbitration proceeding between JCTC and Panama Centroamericana de Navegacion, S.A. ("Panama"), its ocean carrier contracted to carry to Kingston, Jamaica a shipment of rice supplied by CRS.

JCTC alleges that it entered into a commodity contract with CRS for the sale and delivery of 5,250 metric tons of rice to one loadport for the delivery period August 18–September 8, 1984, and, in reliance on the terms of that commodity contract, it entered into a charter party agreement with Panama to transport the rice to Jamaica. The charter party, JCTC alleges, was consistent with the commodity contract in that it provided for one port loading of the cargo; further, although CRS nominated and later reconfirmed the port of Orange, Texas as its sole loadport for the delivery period in question, CRS delivered the rice to two loadports, thus breaching the agreement.

JCTC raises two assertions: first, that the commodity contract nowhere gave CRS a two port loading option, and that CRS breached the commodity contract with JCTC when it failed to have all the rice ready to load at the vessel's call at Orange; and second, that the breach of CRS caused JCTC to suffer damages for which CRS contractually agreed to be responsible and to indemnify JCTC.

CRS denies the allegations made by JCTC and maintains that the commodity contract gave CRS the option to deliver the rice to two loadports. CRS admits that although it nominated Orange for delivery of the entire quantity of rice, it relied on clause XVI(4) of the commodity contract, which allowed it to nominate a second port to satisfy its own scheduling needs. CRS maintains that under clause XVI(4), CRS is contractually obligated to pay damages of $6,500.00, the actual cost of shifting the vessel to the second port. As an affirmative defense, CRS maintains that the damages suffered by JCTC were the result not of any supposed breach on the part of CRS, but of the demands and delays of the ocean carrier Panama occasioned by JCTC's failure to charter a vessel on terms compatible with those of the commodity contract.

The action was tried before this Court on May 8, 9, 10, 11, and 15, 1990. We base our opinion upon the findings of fact and conclusions of law hereinbelow.

### FINDINGS OF FACT

Plaintiff JCTC is an entity owned by the government of the country of Jamaica. It is engaged in the business of, *inter alia,* purchasing rice from foreign suppliers and chartering vessels to transport the rice to Jamaica. (S.F. 1)[1] Defendant CRS is a New Jersey corporation that is engaged in the business of, *inter alia,* buying and selling rice and sugar to domestic and foreign customers. (S.F. 2) Fettig and Donalty, Inc. ("F & D") (not a party to this action) is engaged in the business of, *inter alia,* acting as agent for foreign governments, including Jamaica, in purchasing foodstuffs under the PL–480 program and chartering vessels for the carriage of those foodstuffs from the United States to various recipient countries. The PL–480 program is administered by the Foreign Agricultural Service of the United States Department of Agriculture ("USDA"). (S.F. 3) Under its terms, approximately $1 billion of food aid per year is sent to approximately 35 recipient developing countries throughout the world. (Tr. 19)[2]

JCTC purchases foodstuffs and charters vessels under the PL–480 Program for distribution and consumption in Jamaica. For nearly eleven years F & D has acted as the stateside agent of JCTC in the purchase of PL–480 commodities and in the chartering of ships to transport the commodities to Jamaica. (S.F. 4) Purchasing and chartering are done through Invitations for Bids ("IFB"): a commodity IFB solicits offers from American suppliers to sell commodities to JCTC under the PL–480 program. Similarly, an ocean freight IFB solicits of-

---

**1.** The letters "S.F." followed by a number indicate references to the stipulated facts contained in the parties' Joint Pre-trial memorandum.

**2.** The letters "Tr." followed by a number indicate pages of the official trial transcript.

fers from ocean transportation suppliers to provide vessels to carry the commodities. (S.F. 5) F & D drafts PL–480 IFB's on behalf of JCTC. F & D also drafts the request for a Purchase Authorization ("PA") on behalf of JCTC. A PA is a request from a foreign government to USDA for approval to make purchases under the PL–480 Program; the USDA must issue the PA before an IFB can be released. (S.F. 10)

In 1984, JCTC sought to purchase quantities of rice through the benefit of the PL–480 program. On May 21, 1984, JCTC sent to F & D a "Proposed Schedule–1984 PL–480 Programme," a document that was prepared by JCTC for F & D's use in IFB preparation. (S.F. 7, 8) On May 31, 1984, F & D estimated that JCTC could purchase approximately 15,000 metric tons of rice as follows:

| Delivery Period | Estimated Cost per Metric Ton |
|---|---|
| June 18–22, 1984 | $320.00 |
| July 18–22, 1984 | $320.00 |
| August 18–22, 1984 | $317.50 |

(S.F. 9)

On June 1, 1984, the Embassy of Jamaica, through F & D, submitted to the USDA a request for a PA to buy 15,000 metric tons of rice for delivery between June 27 and September 15, 1984. (S.F. 11) The USDA issued PA No. JM–7036, dated June 6, 1984, authorizing the purchase by JCTC of up to $5,000,000 worth of rice for delivery from June 29 through September 30, 1984. The quantity authorized for purchase was approximately 14,000 metric tons. The delivery terms were "f.a.s. vessel, U.S. port(s) in case of rice in bags...." (S.F. 12) Section 10(f) of the PA regarding contract awards provided:

(i) Whenever purchases are made on the basis of an IFB, the importer shall consider only offers which are responsive to the IFB and shall make awards either on the basis of the lowest commodity price(s) offered or on the basis of lowest landed cost....

. . . .

(iii) For purposes of this section, 'lowest landed cost' means the combination of commodity price and ocean freight rate resulting in the lowest total cost to deliver the commodity to the importing country.... Awards may not be made on the lowest landed cost basis unless IFB's are issued for commodity and ocean freight so that all commodity and ocean freight offers are reviewed simultaneously. (Ex. 4)[3]

Pursuant to USDA PA No. JM–7036, F & D drafted a commodity IFB to request offers from American rice suppliers. (S.F. 15) The IFB provided:

The Government of Jamaica through the Embassy of Jamaica (Buyer) invites bids for the sale of rice in bags, subject to the terms and conditions set forth below and subject to the provisions of PL–480 Title I Financing....

. . . .

GENERAL TERMS

Full details of terms and conditions are in Buyer's Proforma Contract.

. . . .

QUANTITY AND DELIVERY DATES

(a) Approximately 5,000 Metric Tons 5% more or less at Buyer's option for delivery July 6—July 26, 1984.

(b) Approximately 5,000 Metric Tons, 5% more or less at Buyer's option for delivery July 18—August 8, 1984.

(c) Approximately 5,000 Metric Tons, 5% more or less at Buyer's option for delivery August 18—September 8, 1984.

. . . .

DELIVERY

Delivery to be F.A.S. vessel(s) at U.S. Port of Export from one safe berth, one safe port for each lot offered.

LOAD RATE GUARANTEE

Seller guarantees to provide cargo at vessel's call.

(Ex. 7)

The relevant pro forma terms referred to in the IFB provided, in pertinent part:

**3.** The letters "Ex." followed by a number and/or letter indicate exhibits received in evidence at trial.

## V. DELIVERY:

A. Seller shall deliver F.A.S. vessel(s), including any wharfage and handling, at one safe berth one U.S. port.

. . . .

C. Within five (5) calendar days after U.S.D.A. approval of sale, Seller shall notify Buyer of specific port of loading.

. . . .

## XII. ARBITRATION:

Any controversy or claim arising out of or relating to this contract or the breach thereof may be settled by mutual consent by arbitration in New York, New York, in accordance with the Rules of the American Arbitration Association. . . .

. . . .

## XVI. ADDITIONAL CLAUSES:

This contract will also reference all terms and conditions of the Rice Invitation as follows:

. . . .

(3) Seller to make commodity available at not more than one port.

(4) Seller to be responsible for all damages sustained by Buyer due to Seller's failure to perform the terms and conditions of this contract, including without limitation the following:

. . . .

All costs and expenses incurred by Buyer resulting from detention or demurrage incurred by the load port, or incurred by Buyer as result of delays in loading or rehandling caused by delivery of commodity not meeting contract specifications, or for failure of Seller to commence or to maintain continuity of delivery in accordance with the delivery terms specified herein, notwithstanding any custom of the port, to be for Seller's account.

In the event Seller amends or changes their original port nominations in order to satisfy Seller's own scheduling and for Seller's own benefit, then Seller is obligated to pay vessel's deviation, and additional cost and resulting demur-

rage, if any, occasioned by second port nomination, and to waive carrying charges resulting from delay in loading attributed to changed nomination of original port.

. . . .

Supplier guarantees to provide cargo at vessel's call.

(Ex. 7) (emphasis ours)

By letter dated June 5, 1984, F & D forwarded its draft of the commodity IFB and the JCTC pro forma "Bagged Rice Contract" to USDA. It is a USDA requirement for IFB's to be submitted for approval before offers are solicited in the market. (S.F. 16) USDA approved the commodity IFB into which the JCTC pro forma "Bagged Rice Contract" was incorporated. (S.F. 17) On June 7, 1984, F & D issued the IFB on behalf of JCTC to various U.S. suppliers, including CRS[4], which requested bids for the sale of approximately 15,000 metric tons (5% more or less) of U.S. grade No. 5 or better long grain well milled rice in bags. (S.F. 18) All commodity bids were due June 14, 1984 at 3 P.M. (Ex. 8)

On June 8, 1984, F & D, on behalf of JCTC, issued a USDA-approved ocean freight IFB, requesting bids, *inter alia*, for the carriage of the bagged rice from the U.S. Gulf of Mexico to Kingston, Jamaica aboard U.S. or non-U.S. vessels. Loading was to be from one or two safe berths at one safe United States Gulf of Mexico port per delivery period. All freight bids were due June 14, 1984 at noon. (Ex. 10)

On June 14, 1984, in response to the commodity IFB, JCTC, through F & D, received five offers. (S.F. 20) Among them was the following offer made by CRS:

(a) Two Lots of up to 3,000 Metric Tons each, 5% more or less at Buyer's option, (total of 6,000 Metric Tons, 5% more or less at Buyer's option) each lot of $307.18 repeat $307.18 per Metric Ton of 2,204.6 lbs. net FAS vessel(s) U.S.A. Gulf Port(s). U.S.A. Gulf Port(s) to be at

---

**4.** CRS has participated in PL-480 sales since the inception of the program in the 1950's and makes offers against commodity IFB'S, such as the one issued by Fettig & Donalty on behalf of Jamaica Commodity, which has become the subject of this action.

Seller's option. Delivery from July 6 to July 26, 1984, both dates inclusive.

(Ex. 9).

The terms for delivery periods July 18— August 8 and August 18—September 8, 1984 were the same as for the first. The offer was signed by Jonathan Perry as Vice President for CRS and contained the following clause:

P.S. Please contact Mr. Grover Connell, President, at telephone number (201) 233–0700 (after business hours, (201) 233–7030), should you have any question in connection with the above.

*Id.*

Additionally, on June 14, 1984, JCTC received 12 offers in response to the freight IFB, including the offer made by Panama through its agent, Sealift. The Panama offer covered the first and third delivery periods: for the first delivery period, July 6–16, 1984, Panama offered to pick up the rice at 1 or 2 safe berths at Lake Charles, Louisiana, for $38.50 per metric ton. For the third delivery period, August 18–28, 1984, Panama offered transport from 1 or 2 safe berths, 1 safe U.S. Gulf port, for $39.50 per metric ton. (Ex. 11) The offers were opened in a public opening at the offices of F & D in Washington, D.C. at 3 P.M. on Thursday, June 14, 1984 and initially reviewed. (Tr. 54) The next day, employees of F & D, along with John Anton Thompson, commodity manager for JCTC, met with a USDA representative at the USDA office in Washington, D.C. to discuss the freight and commodity offers. (Tr. 56, 58, 287) The commodity offer made by CRS seemed to the group to be outside the parameters required by the commodity IFB. The USDA representative suggested that in light of the fact that the CRS offer had the lowest commodity price, F & D should contact CRS immediately by telephone to determine, by way of clarification, whether in fact the commodity offer as received was responsive to the commodity IFB. (Tr. 58) Ronald Fettig, named partner of F & D, made a calling card charge call to the offices of CRS in New Jersey and asked for Grover Connell as per the instructions on the commodity offer.

(Tr. 58) Mr. Thompson testified before us that he was with Mr. Fettig at the USDA when Mr. Fettig called CRS, and that Mr. Fettig reported to the group after he hung up that he had spoken with Mr. Connell and that the problem was resolved. (Tr. 290) Mr. Thompson testified that the problem referred to was an ambiguity as to the number of ports per delivery position that would be required to load the cargo. (Tr. 291)

Recollections of Mr. Fettig and Messrs. Perry and Connell diverge as to the particulars of this telephone conversation. Mr. Fettig maintains that he dialed the number for Mr. Connell that appeared at the bottom of the CRS offer, asked to be connected to Mr. Connell, spoke to Mr. Connell and resolved the matter with him. Mr. Fettig testified that Mr. Connell told him that CRS was going to use three ports, Lake Charles, Louisiana; Houston, Texas; and Orange, Texas, and that Mr. Connell agreed that he would make the cargo available at one port out of those three ports for each of the three delivery periods. Further, Mr. Fettig claims that Mr. Connell said he would check, at Mr. Fettig's request, to see whether he could eliminate the port of Orange from consideration in the second period. (Tr. 59) During the conversation, Mr. Fettig made the following notes on the back of the CRS offer:

Grover Connell

L. Chas. Houston Orange

1 pt. ea. position

(Ex. 15)

Conversely, Jonathan Perry of CRS testified that Mr. Fettig spoke not with Mr. Connell but with him on Friday, June 15, 1984, and that Mr. Fettig asked if CRS would consider a single loadport for the two lots of rice offered in each of the three delivery positions; Mr. Perry responded that he would pursue it and call Mr. Fettig back with an answer. (Tr. 452) Mr. Perry, who has alternately described himself as a go-between in the bid process (Tr. 470–71), a rice economist (Tr. 447), and Vice President of the company (Ex. 9, 15), then testified that since he had no authority to make that decision, he spoke with Mr. Connell

and related in great detail the request made by Mr. Fettig, whereupon Mr. Connell responded, "[l]et me think about it," or, "I'll get back to you." (Tr. 453) Mr. Perry further testified that although he had not called back Mr. Fettig regarding his request for a single loadport, later that day he received a second telephone call from Mr. Fettig asking if CRS would consider eliminating the port of Orange from consideration for the second delivery period. (Tr. 453–4) Mr. Perry claimed that since he had no authority to make this decision either he would be required to follow the identical procedure as for the first telephone call. Mr. Connell testified before us that he had no recollection of any conversation with or regarding Mr. Fettig at any time. (Tr. 504, 505, 506)

Mr. Perry testified that he prepared the following internal memorandum of the telephone calls with Mr. Fettig on June 15, 1984, after they spoke the second time: (Tr. 455)

1) 6/15/84—(am) RF called wanting to know if we would agree to one port per loading period for the two lots offered per period.

2) 6/15/84—(pm) RF called and wanted to know if we would eliminate Orange as a port for the second shipping period.

(Ex. L)

After the second entry there was an additional notation: "we agreed to eliminate Orange in 2nd period." There was no notation after the first entry. Mr. Fettig did not recall a second conversation with anyone at CRS on June 15, 1984, but had a notation indicating that he did have a subsequent conversation with the officers of CRS wherein the parties agreed to eliminate Orange as a possible loadport in the second position. (Tr. 76, 244, 245)

Mr. Perry further testified that he received a third telephone call from Mr. Fettig, this time on Monday, June 18, 1984 at approximately 11:50 A.M. (Tr. 456) The third call was added to the memorandum as follows:

3) 6/18/84—(approx. 11:50 am) RF called and wanted to know if we would agree to him treating both lots for delivery in

1st & 3rd shipping period as a single lot as far as his setting up credits w/ Bank of Jamaica.

(Ex. L)

There was a notation to that entry which read, "we called back and said NO." *Id.* Mr. Fettig had no recollection of a conversation with anyone at CRS on June 18, 1984. (Tr. 245) Telephone bills of F & D for the dates in question show the following calls to CRS:

| | | |
|---|---|---|
| June 15, 1984 | 10:12 A.M. | 2 minutes (calling card charge) |
| June 15, 1984 | 4:41 P.M. | 3 minutes |
| June 19, 1984 | 9:46 A.M. | 3 minutes |

(Ex. CF)

There is no telephone charge for any call from F & D to CRS on June 18, 1984. Telephone bills of CRS for those dates had been destroyed prior to this action in the normal course of business.

It was a requirement of JCTC, to be in conformity with the USDA, that the commodity purchase be made where possible on the basis of the lowest landed cost, the combination of commodity price and freight charges that would result in the lowest price per metric ton upon delivery to Jamaica. (Tr. 68) After F & D returned from the USDA offices on June 15, 1984, a worksheet was constructed using the ports Mr. Connell had indicated CRS would use, i.e., Lake Charles, Orange, and Houston. (Ex. 21, Tr. 59) With the clarification of one loadport per delivery position, the CRS commodity offer, combined with the Panama freight offer, made for the lowest landed cost for the first and third delivery periods. At approximately 4:55 P.M., June 15, 1984, Mr. Fettig placed a telephone call to CRS and accepted its offer to supply two lots of rice in the first delivery period, one lot of rice in the second delivery period, and two lots of rice in the third delivery period. (Tr. 202) The second lot for the second delivery period went to Supreme Rice Mill, Inc. (Tr. 78)

On Monday, June 18, 1984, F & D sent the following telex to CRS:

ON BEHALF OF THE EMBASSY OF JAMAICA, WE HEREBY CONFIRM THE FOLLOWING PURCHASES:

TIME OF SALE: 1655 HOURS ETD, 15 JUNE 84

U.S. LONG GRAIN RICE, WELL MILLED, MAXIMUM 20 PCT BROKEN KERNELS, PACKED IN BAGS IN ACCORDANCE WITH INVITATION TO BID.

| DELIVERY | QUANTITY | PRICE |
| --- | --- | --- |
| LOT # 1<br>JUL 6/26, 1984 | 2894.7 MT, 5% LESS IN<br>BUYER'S OPTION | USD 307.18<br>PER NET MT<br>FAS VESSEL |
| LOT # 2<br>JUL 6/26, 1984 | 2894.7 MT, 5% LESS IN<br>BUYER'S OPTION | USD 307.18<br>PER NET MT<br>FAS VESSEL |
| LOT # 3<br>JUL 18/AUG 8, 1984 | 2390 MT, 5% LESS IN<br>BUYER'S OPTION | USD 307.18<br>PER NET MT<br>FAS VESSEL |
| LOT # 4<br>AUG 18/SEPT 8, 1984 | 2626 MT, 5% LESS IN<br>BUYER'S OPTION | USD 307.18<br>PER NET MT<br>FAS VESSEL |
| LOT # 5<br>AUG 18/SEPT 8, 1984 | 2626 MT, 5% LESS IN<br>BUYER'S OPTION | USD 307.18<br>PER NET MT<br>FAS VESSEL |

LOTS 1 & 2 ARE TO BE DIVIDED BY SELLER TO ONE SAFE BERTH EACH LOT, ONE SAFE PORT ONLY OUT OF LAKE CHARLES, HOUSTON, OR ORANGE, AT SELLER'S OPTION. LOT 3 IS TO BE DELIVERED BY SELLER TO ONE SAFE BERTH, ONE SAFE PORT ONLY OUT OF LAKE CHARLES OR HOUSTON, AT SELLER'S OPTION. LOTS 4 & 5 ARE TO BE DELIVERED BY SELLER TO ONE SAFE BERTH EACH LOT, ONE SAFE PORT ONLY OUT OF LAKE CHARLES, HOUSTON, OR ORANGE, AT SELLER'S OPTION.

(Ex. 18; AY) (emphasis ours)

---

The word "DIVIDED," underscored above, was crossed out in pencil on Fettig & Donalty's copy, and the word "Delivered" was written in above it. That correction made the delivery instructions for lots 1 and 2 the same as those for lots 3, 4 and 5 in the telex. Mr. Fettig did not recall whether a corrected copy was ever sent to CRS or if an advising telephone call was ever made. (Tr. 249) Joseph Ravener, Vice–President of Traffic for CRS, testified that he was confused when he received the telex as to whether it meant CRS had one loadport or two loadports per delivery period, yet he did not contact anyone at F & D for clarification or to raise an objection. (Tr. 391) On June 19, 1984, F & D contracted with Panama to ship the rice to Jamaica. The charter party provided for one port loading

in the first and third delivery periods. (Ex. 23)

On June 27, 1984, F & D sent a telex to CRS, requesting that it nominate the load-port for the first delivery period. (Ex. 32) On June 28, 1984, CRS responded by return telex:

WE NOMINATE THE PORTS OF ORANGE, TEXAS AND LAKE CHARLES, LOUISIANA FOR THE LOADING OF THE 5,789.4 METRIC TONS OF RICE. THIS RICE IS AVAILABLE FOR LOADING JULY SIXTH.

(Ex. 33)

F & D responded with the following telex to CRS:

URGENT URGENT URGENT

PER CONTRACT THE SUBJ CARGO IS TO BE DELIVERED AT ONE RPT ONE LOADPORT ONLY, OUT OF LAKE CHARLES, HOUSTON AND ORANGE.

PLS NOMINATE THE SOLE LOADPORT BY RETURN TLX.

BUYERS HEREBY NOMINATE THE "GOOD PIONEER", PAN FLG, WITH LOAD READINESS JULY 8, 84, TO LOAD THE FULL QUANTITY.

PLS TREAT THIS AS THE REQUIRED NOTICE UNDER THE CONTRACT....

WE ALSO ASK YOU TO NOMINATE LDPT FOR THE REMAINING CARGO IMMEDIATELY.

(Ex. 34) (emphasis ours)

Mr. Ravener testified that when he received the telex, he was surprised, and spoke to Mr. Connell about it. He testified that Mr. Connell remarked, "[t]hey're a good customer, work it out ...," and that he, Mr. Ravener, said, "[y]es, I can work it out, [delivering the rice to one loadport per delivery position,] provided we go to Lake Charles for the first port period; for the second period, we go to Houston; third period we have a portion of the cargo available at Orange, and we have to buy in the balance." Mr. Ravener further testified that Mr. Connell responded, "[g]o that route, make the nomination." (Tr. 337) On July 2, 1984, CRS sent the following telex to F & D:

WE NOMINATE PORT OF LOADING FOR EACH OF THE THREE SHIPPING PERIODS AS FOLLOWS:

JULY 6–16—5,789.40 METRIC TONS—LAKE CHARLES, LOUISIANA

JULY 18–AUGUST 8—2,390 METRIC TONS—HOUSTON TEXAS

AUGUST 18–SEPTEMBER 8—5,250 METRIC TONS—ORANGE, TEXAS

PLEASE NOMINATE A VESSEL FOR EACH SHIPPING PERIOD AND ADVISE VESSELS ETA AT EACH LOAD PORT

(Ex. 36)

On July 2, 1984, CRS did not have the full cargo at Orange for the 3rd delivery period. (Tr. 419) The next day, Mr. Ravener contacted CRS's freight forwarder with the following information:

Shipping Period: July 6–July 26
Port of Loading: Lake Charles, LA

Shipping Period: July 18–August 8, 1984
Port of Loading: Houston, TX

Shipping Period: August 18–September 18, 1984
Port of Loading: Orange, TX
Origin: On Dock Port of Orange 58,426 Bags—Need 57,315 Bags. We will advise origin later.

(Ex. 72)

Via letter dated July 5, 1984, F & D sent a Bagged Rice Contract to CRS, which was as per the pro forma but included the specifics of this particular sale: (Tr. 84–86)

V. DELIVERY

A. Seller shall deliver F.A.S. vessel(s), including and wharfage and handling, at one safe berth, one safe U.S. port out of Houston or Lake Charles for delivery position number two (2), and at one or two safe berths each, one safe port each, out of Lake Charles, Houston, or Orange, for delivery positions numbers one (1) and three (3).

. . . .

## XVI. ADDITIONAL CLAUSES

(3) Seller to make commodity available at not more than one port per delivery position.

(Ex. 20) (emphasis ours)

The portions underlined in clauses V.A. and XVI.(3) were not in the original pro forma. Although a signed copy was never returned to F & D, Mr. Ravener recalled reviewing it and signing it without protest sometime after it was received. (Tr. 438, 439)

The first delivery of two lots through Lake Charles, July 6–16, 1984, and the second delivery of one lot through Houston, July 18–August 8, 1984, both transpired without difficulty. On August 7, 1984, in reference to the third delivery period, August 18–September 8, 1984, F & D sent the following telex to CRS:

BUYERS HEREBY NOMINATE THE "GOOD PIONEER", PAN FLAG, WITH LOADREADINESS AUGUST 18, 1984 TO LOAD THE FULL QUANTITY.

PER CONTRACT, SUBJ CARGO IS TO BE DELIVERED AT ONE LOADPORT ONLY OUT OF LAKE CHARLES, HOUSTON, AND ORANGE.

PLS NOMINATE THE SOLE LOADPORT BY RETURN TELEX/PLS TREAT THIS AS THE REQUIRED NOTICE UNDER THE CONTRACT.

(Ex. 38)

When no return telex was received, Todd Johnson of F & D called Mr. Ravener on August 9, 1984 to confirm the port of Orange as sole loadport for all the rice for the third delivery period; Mr. Ravener confirmed that it would be. (Tr. 114) Written confirmation of the telephone conversation was sent to Mr. Ravener the next day. (Ex. 40)

On August 10, 1984, F & D received the 144–hour Notice of Load–Readiness from Sealift, the agent of Panama. (Ex. 41) On August 13, 1984, F & D sent a telex to Sealift nominating Orange as the loadport for the third delivery period. (Ex. 42) On August 14, 1984, F & D received the 72–hour Notice for Loadreadiness. (Ex. 42–A)

On August 16, 1984, F & D received the following telex from Sealift:

… OWNERS GIVE 48 HRS NOTICE FOR LOADREADINESS ORANGE, TX ON OR ABOUT AUGUST 18 … ALL GOING WELL. WE UNDERSTAND FROM AGENTS AND STEVEDORES THAT ONLY 2600 TONS IS AVAILABLE. PLEASE CONTACT SUPPLIERS AND CONFIRM ALL CARGO IS READY FOR THE 18TH IN ORDER TO AVOID DEADFREIGHT CLAIM OR DETENTION. PLEASE CONFIRM.

(Ex. 43)

That day, Mr. Johnson contacted Ken Florky of CRS who confirmed to him that all the rice would be in order for loading at Orange by August 20. (Tr. 123) Mr. Johnson then advised Sealift of that confirmation. (Tr. 124) On August 18, 1984 Mr. Ravener was advised that CRS had purchased the remainder of rice not for Orange, but for Lake Charles. (Tr. 348) Most of the rice was purchased on the dock at Lake Charles, but approximately 3,000 bags were to be trucked in. (Tr. 373, 374) Mr. Ravener testified that from the time of the nomination of Orange on July 2, 1984, until August 18, 1984, when he was informed that CRS had arranged to have the additional rice at Lake Charles, the Logistics Department at CRS was working with its traders to purchase the rice. (Tr. 346) F & D was not informed of any problems in getting the full load of rice to Orange. On August 20, 1984, the vessel, Good Pioneer, docked at Orange, Texas; on August 22, it commenced loading. (Ex. 47)

Sometime between August 18 and the 22nd or 23rd, CRS advised F & D that almost half of the rice that was needed for the third delivery period would not be available at Orange; instead, it would be available at Lake Charles. (Tr. 348) Although there was some confusion as to the exact date F & D was advised, on August 23, 1984, it was clear to F & D that CRS did not have all the rice for the third delivery period available at Orange. (Tr. 140) That day F & D sent the following telex to CRS:

UNDER PA JM–7036, ALL CARGO PURCHASED BY JCTC, FOR POSITIONS 1 AND 3 WAS TO BE FURNISHED BY [CRS], UNDER SALE

CONCLUDED ON JUNE 18TH AT 1655 HRS EDT, AT ONE SAFE PORT OUT OF LAKE CHARLES OR HOUSTON OR ORANGE. ON JULY 2, 1984 WE RECEIVED A MESSAGE FROM [CRS] ADVISING THAT PORT OF LOADING FOR THE 5250 MTS FOR SHIPPING PERIOD AUGUST 18/3 SEPTEMBER WOULD BE ORANGE, TEXAS. WE WERE ADVISED SUBSEQUENTLY BY [CRS] THAT SOME OF THE CARGO WAS IN ORANGE, AND THE BALANCE AT LAKE CHARLES. THIS IS CONTRARY TO SALE. WE TRIED TO GET OWNERS OF THE "GOOD PIONEER" (THE VESSEL PRESENTLY LOADING THIS CARGO AT ORANGE) TO GO TO LAKE CHARLES FOR THE BALANCE OF CARGO. OWNERS ARE STANDING BY THE TERMS OF THE CHARTER WHICH CALLS FOR ONE LOAD PORT (SUBJECT VESSEL WAS CHARTERED THAT WAY BASED ON THE TERMS OF THE SALE). ON BEHALF OF BUYERS, WE MUST HOLD CRS & SUGAR CO. RESPONSIBLE FOR ALL DAMAGES INCLUDING BUT NOT LIMITED TO DETENTION, DEADFREIGHT, CAUSED BY THEIR FAILURE TO MEET THEIR CONTRACTUAL OBLIGATIONS. IT IS IMPERATIVE THAT [CRS] DO WHATEVER IS NECESSARY TO MOVE THE CARGO IN LAKE CHARLES TO ORANGE TEXAS IMMEDIATELY IN ORDER TO ALLOW THE VESSEL TO COMPLETE LOADING AND SAIL WITHOUT ANY DELAYS.

(Ex. 48 p. 5)

On August 24, 1984, CRS sent a telex to F & D, itemizing the costs for the Good Pioneer to call at Lake Charles. (Ex. 48 pp. 11–12) CRS estimated it would cost $9,200.00 to cover the vessel for two days in port if all went well. Sailing time from Orange to Lake Charles was estimated at 14 hours; costs incurred for shifting ports and sailing time were not included in the estimate. CRS further estimated that JCTC would save $1,260.00 by loading at Lake Charles as opposed to Houston. As authority for its contention that it was able to utilize a second loadport, CRS cited to clause XVI(4) of the Commodity Contract:

IN THE EVENT SELLER AMENDS OR CHANGES THEIR ORIGINAL PORT NOMINATIONS IN ORDER TO SATISFY SELLER'S OWN SCHEDULING AND FOR SELLER'S OWN BENEFIT, THEN SELLER IS OBLIGATED TO PAY VESSEL'S DEVIATION, AND ADDITIONAL COST AND RESULTING DEMURRAGE, IF ANY, OCCASIONED BY SECOND PORT NOMINATION, AND TO WAIVE CARRYING CHARGES RESULTING FROM DELAY IN LOADING ATTRIBUTED TO CHANGED NOMINATION OF ORIGINAL PORT.

*Id.*

CRS confirmed that it would absorb all costs associated with second port nomination, and asked that the vessel proceed to Lake Charles. F & D responded that the owners of Good Pioneer refused to move, and insisted that CRS conform to the terms and conditions of the commodity contract. Further, F & D maintained that "clause XVI(4) referred to in your telex in no way gives [CRS] the right to ask for and/or demand a second port of loading." (Ex. 48 p. 15)

Numerous telexes were sent between F & D and CRS between August 24 and the morning of August 28, 1984. (Ex. 48 pp. 17–34) F & D maintained that Good Pioneer would not shift, and that CRS must abide by the terms of the contract and truck the rice to Orange, a distance of approximately 40 miles. CRS maintained that the rice was waiting at Lake Charles, and that it was clearly unreasonable for the vessel to refuse to shift in order to continue loading uninterrupted. *Id.*

On the afternoon of August 28, 1984 Panama made the following proposal for the shifting of the vessel to Lake Charles:

1) FRT RATE—WILL BE USD 39.00 PER GROSS M/T FOR ALL CARGO, BASIS LOADING ORANGE AND L. CHAS

2) CHAR[TERERS] TO PAY LUMPSUM USD 35,000 TO ACTUAL OWNERS

COVERING PORT DISBURSEMENTS, SHIFTING COSTS, ETC. CHAR[TERERS] TO UNDERTAKE TO REMIT PORT DISBURSEMENTS FOR L. CHAS FROM THIS 35,000. BALANCE OF 35,000 TO BE PAID PRIOR RELEASING B/LS

3) USD 15,000 ADDITIONALLY TO BE PAID TO DISPONENT OWNRS TO COVER THEIR EXTRA COSTS FOR STEVE[DORE] LABOR, ETC. THIS ALSO TO BE PAID PRIOR RELEASING B/LS

4) LAYTIME FOR LOADING ORANGE AND L. CHAS TO COUNT CONTINUOUSLY AND TIME SHIFTING FROM ORANGE TO L. CHAS TO COUNT AS LAYTIME. TIME TO CONTINUE EVEN IF VSL DELAYED DUE TO FOG OR FOR ANY OTHER REASON.

5) ANY STEVE[DORE] STANDBY TIME IN L. CHAS DUE TO W[EATHER] TO BE FOR CHAR[TERER'S] ACC[OUNT]

(Ex. 48 p. 34)

F & D telexed the proposal to CRS with the substitution that all charges would be against CRS instead of "CHARTERERS" as per Panama's proposal. (Ex. 48 p. 35)

CRS rejected the proposal but agreed to be responsible for extra port costs which it estimated at approximately $9,200. It maintained that no demurrage/detention charges should be paid as no demurrage/detention would have occurred if the vessel had sailed directly from Orange when it completed loading on Friday, August 24, 1984. (Ex. 48 p. 36)

The parties could not reach an agreement, and the vessel, Good Pioneer, stood idle at the Orange from 5:00 P.M. August 24, 1984, to September 6, 1984. (Ex. 47) The vessel had been instructed by its owners to withhold delivery to CRS of the ocean Bill of Lading until CRS delivered the remainder of the rice to Orange. Without the Ocean Bill of Lading, CRS did not have the required papers to present to the bank to receive payment for the rice that had already been delivered and loaded.

On September 5, 1984, CRS filed suit against the Good Pioneer in the United States District Court for the Eastern District of Texas, requesting that the ocean Bill of Lading be released. (Ex. AS) Panama released the Bill of Lading the next day (Tr. 361), and agreed to shift the vessel to Lake Charles and submit to arbitration with JCTC, as per the charter party, to resolve the issue of who should bear the responsibility for the additional costs. (Ex. 50) CRS made no agreement with either JCTC or Panama for the vessel to sail to Lake Charles. (Tr. 362) The vessel sailed from Orange on September 6 and completed loading at Lake Charles on September 11, 1984. (Ex. 51) At Lake Charles, the vessel was again instructed to withhold the ocean Bill of Lading. On September 11, 1984, CRS filed suit against the Good Pioneer in the United States District Court for the Western District of Louisiana, requesting the release of the Bill of Lading. (Ex. AW) Panama released it that day without any further proceedings, and the vessel sailed for Kingston, Jamaica. (Ex. 51)

On December 14, 1984, JCTC served a "Vouching In Notice" on CRS which demanded that it appear and defend the claim against JCTC in its arbitration with Panama. (Ex. 57) CRS refused. (Ex. CE) On February 22, 1985, JCTC filed a petition in this Court to obtain an order compelling CRS to participate in a consolidated arbitration with JCTC and Panama. On May 23, 1985, United States District Judge Charles S. Haight, Jr. denied JCTC's petition. *Jamaica Commodity Trading Company Limited v. Connell Rice & Sugar, et al.,* No. 85 Civ. 1210, 1985 WL 1423 (S.D.N.Y. May 23, 1985). In his Memorandum Opinion and Order, Judge Haight stated that although CRS was bound by the arbitration clause in the commodity contract, the clause, which made arbitration optional, not mandatory, could not be used to compel CRS into arbitration. (*Id.*)

On July 29, 1985, JCTC and Panama entered into an arbitration submission agreement in which Panama set forth its claim for $90,799.49. (Ex. 58) On October 17, 1986, the arbitrator, Mr. Jack Berg, awarded Panama damages in the amount of $107,523.95, comprising $50,000 in second

loadport expenses, $39,779.49 in demurrage, $1,020 in legal fees for the proceeding in the United States District Court for the Eastern District of Texas, plus $16,724.46 in interest from September 30, 1984 to the date of the award. An arbitrator's fee of $3,200 was set, to be shared equally by Panama and JCTC. (Ex. 62)

On December 22, 1986, JCTC paid Panama $107,523.95 in full and final satisfaction of the arbitration award (Ex. 63), and paid its share of the arbitrator's fee ($1,600). (Ex. 64) Additionally, JCTC incurred legal fees defending the arbitration in the amount of $14,482.95. (Ex. 65)

## CONCLUSIONS OF LAW

*The Effect of the Arbitration Result*

■■■ We first address the issue of whether CRS is bound by the result of the arbitration between JCTC and Panama. If not, we must examine the breach of contract claims.

"Dispute resolution by arbitration is and must be consensual." *Continental Group, Inc. v. N.P.S. Comm., Inc.*, 873 F.2d 613, 617 (2d Cir.1989). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *United Steelwkrs. of America v. Warrior and Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, 1413 (1960); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir. 1980). However, under 9 U.S.C. § 4, "[a] party aggrieved by the alleged failure ... or refusal of another to arbitrate under a written agreement for arbitration may petition ... [the] court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." *Continental Group, supra*, 873 F.2d at 617. Pursuant to that section, and 9 U.S.C. § 206, the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, JCTC filed a petition to compel CRS into a consolidated arbitration with Panama. Judge Haight, in his Memorandum Order and Opinion, determined that the decisive question was whether JCTC could point to an agreement on the part of CRS to arbitrate. No such agreement could be found. Although the JCTC–CRS commodity contract did contain an arbitration clause, arbitration thereunder was optional, not mandatory; therefore, JCTC could not use the clause to compel CRS to arbitrate. *Jamaica Commodity, supra*, No. 85 Civ. 1210 at 4–6. On May 23, 1985, the JCTC's petition was denied. *Id.* at 9.

Nonetheless, on July 22, 1985, JCTC sent another copy of the vouching-in notice to CRS (the original notice had been sent December 17, 1984). (Ex. 57) CRS replied by letter dated July 25, 1985:

> Your letter of July 22nd came as a surprise in view of the decision of the United States District Court, Southern District of New York dated May 23, 1985 denying JCTC's attempt to involve [CRS] in the arbitration proceedings between JCTC and P[anama]. Whatever claim JCTC believes it may have against CRS by way of indemnity, or otherwise, will be resolved in the courts, not before arbitrators.

(Ex. CD)

The JCTC–Panama arbitration hearing went forward without CRS's participation, and the arbitrator found for Panama. JCTC now seeks to bind CRS to the results of the arbitration; CRS resists.

Both parties rely on *SCAC Transport (USA) Inc. v. S.S. DANAOS*, 845 F.2d 1157 (2d Cir.1988), in asserting their respective positions. JCTC contends that in *DANAOS*, the Second Circuit held that a vouching-in notice serves to bind a party to the result of an arbitration when that party refuses to consent to participate in the arbitration; therefore, the result of the JCTC Panama arbitration should bind CRS. Plaintiff's Reply to Defendant's Post–Trial Brief ("Plaintiff's Reply") at 51. CRS argues that, unlike the stevedore in *DANAOS*, CRS owed no duty "implied by law" directly to the shipowner to perform its "services in a workman-like manner." Post–Trial Brief of Defendant Connell Rice & Sugar Co., Inc. ("Defendant's Memo") at 72. Furthermore, CRS argues that it cannot be bound by the decision of the arbitra-

tor because its interests were not adequately represented in the arbitration. *Id.* at 74.

In *DANAOS*, a shipping company chartered a vessel to transport a motor vehicle to West Africa and contracted with a stevedore company to load the vehicle on the vessel. During loading, while the vehicle was suspended from a lift, the mechanism for raising and lowering the lift, which was being operated by the stevedore company, failed. The vehicle fell from the lift, damaging the vehicle, the lift and the vessel. *DANAOS, supra*, 845 F.2d at 1159. The charterer and the shipowner submitted their dispute over damages to arbitration as required by their charter party, and the charterer, in seeking to have the stevedore company assume its defense in the arbitration, sent a vouching-in notice to the stevedore. The stevedore company declined to assume the charterer's defense. The arbitrator found for the shipowner. *Id.* at 1160.

The charterer then sought indemnification from the stevedore company in this court, based on the finding of the arbitrator that the stevedore company had been negligent in its operation of the winch. *Id.* at 1161. Our court held that the stevedore company "was not estopped from contesting factual issues decided by the London arbitrators because it did not participate in or consent to be bound by the [arbitration]," but then found the stevedore liable to indemnify the shipper based on a negligence theory. *Id.* On appeal, the Second Circuit reversed, identified the issue to be "whether a stevedore may be vouched into an arbitration without its consent," *Id.* at 1159, and modified the award, holding that "absent a particularized showing of prejudice, a stevedore may be vouched into arbitration under a charter party by a charterer [without consenting] where the stevedore is the charterer's indemnitor." *Id.* at 1163. The Circuit Court stated further, "[t]he existence and scope of [the stevedore]'s indemnity obligation to [the charterer] is beyond dispute. A stevedore must indemnify a shipowner or charterer to whom it has contracted to provide stevedoring services for losses that party sustains

from the stevedore's breach of its warranty of workmanlike services." *Id.* at 1164.

In reaching its conclusion, the Second Circuit applied a test for determining the preclusive effect of an ignored vouching-in notice: a court adjudicating a separate action for indemnification must first scrutinize whether the indemnitee adequately represented the indemnitor's interests in the prior action. If not, the indemnitor will not be bound by the result of the arbitration. If so, the court must next scrutinize whether procedural opportunities in the present action might likely cause a different outcome than in the prior action. If so, the indemnitor will similarly not be bound. *Id.* at 1162.

When we apply the *DANAOS* test to the present facts, we conclude that CRS is not bound by the arbitration results. First, as will be discussed in the following section, CRS was not JCTC's indemnitor. However, even if CRS was in a relationship whereby it would be required to indemnify JCTC, it would still not be bound under the *DANAOS* test. An indemnitor is bound by the result of an arbitration to which it was not a party only when its interests have been adequately represented in the original action by the indemnitee. *Id.* at 1162. In the instant case, JCTC never presented CRS's key arguments, namely that it had an option for two port loading, that the commodity contract and charter party were arranged on inconsistent terms, and that CRS had to initiate two suits in federal court to compel Panama to release the bills of lading. JCTC could not reasonably forward those arguments without exposing itself to liability. JCTC's strongest argument was that it was caught in the middle, between Panama and CRS. This certainly did not adequately represent the interests of CRS in the prior proceeding. By its very posture in the action before us, JCTC has foreclosed itself from arguing that it adequately protected the interests of CRS in the arbitration. *Marathon Int'l Petroleum Supply Co. v. I.T.I. Shipping, S.A.*, 740 F.Supp. 984, 988 (S.D.N.Y.1990).

Moreover, the Second Circuit specifically limited its holding in *DANAOS* to apply to

stevedores in maritime disputes with charterers or shipowners, thus further distinguishing *DANAOS* from the instant action. *Id.* CRS was not a stevedore, it was a commodity seller, and the JCTC–CRS commodity contract was not a maritime charter party in which disputes are commonly resolved by arbitration, *see DANAOS, supra,* at 1163, but a commercial sales contract. The dispute at issue was not maritime in nature, but contractual, an area in which arbitration has not largely taken the place of litigation as a means of dispute resolution.

After careful consideration of *DANAOS* and surrounding law, we are compelled to find that the vouching-in notice did not bind CRS to the results of the arbitration.

*Indemnification*

 We next turn to the issue of whether CRS agreed to indemnify JCTC for damages it allegedly incurred as a result of CRS nominating a second loadport. JCTC argues that CRS expressly agreed, through specific language in the contract, to indemnify it for any damages incurred; yet in presenting its argument, JCTC asks us to look to the language of contract clause XVI(4) to infer that an implied indemnification agreement existed. Plaintiff's Reply at 46. JCTC argues that based on that indemnification agreement, the failure of CRS to deliver all the rice at Orange gave rise to an indemnity claim in favor of JCTC. *Id.* CRS maintains that there was no express indemnification clause in the contract, Reply Brief of Defendant Connell Rice & Sugar Co., Inc. ("Defendant's Reply") at 28–9; in addition, according to the test set forth in *Peoples' Democratic Republic of Yemen v. Goodpasture, Inc.,* 782 F.2d 346 (2d Cir.1986), there was no implied contract of indemnification between the parties. Defendant's Memo at 69–73. JCTC contends that *Yemen* is clearly distinguishable because it involved a situation where, unlike here, the parties had no express indemnity agreement and the Court had to decide whether an implied contract for indemnity existed. Thus, JCTC claims, the test used in *Yemen* would not apply to the instant case. Plaintiff's Reply at 47.

"The law of New York requires that an indemnity agreement must be expressed in unequivocal terms and be strictly construed." *Guarnieri v. Kewanee–Ross Corp.,* 263 F.2d 413, 422, *opinion modified on other grounds on reh'g,* 270 F.2d 575 (2d Cir.1959); *see also, Jones v. United States,* 304 F.Supp. 94, 103 (S.D.N.Y.1969) (Weinfeld, J.), *aff'd* 421 F.2d 835 (2d Cir. 1970). Contrary to the contentions of JCTC, the JCTC–CRS commodity contract does not contain an express indemnification clause, and nowhere in the contract do the words "indemnify" or "indemnification" appear, nor does other language which would explicitly and unambiguously set forth an agreement between the parties that CRS would indemnify and save JCTC harmless against all claims arising out of the parties' contract. *See generally, Gibbs v. United States,* 599 F.2d 36, 40 (2d Cir.1979), *Stuto v. Coastal Dry Dock & Repair Corp.,* 153 A.D.2d 937, 545 N.Y.S.2d 743 (2d Dep't. 1989), *appeal dismissed,* 75 N.Y.2d 865, 552 N.Y.S.2d 930, 552 N.E.2d 178 (1990).

In the absence of an express indemnification agreement, an implied right of indemnification can still be found in either of two circumstances. First, such right may be based on the special nature of a contractual relationship between the parties ("implied in fact" indemnity); additionally, there is a tort-based right to indemnification when there is a great disparity in the fault of two tortfeasors and one has paid for a loss that was primarily the responsibility of the other ("implied in law" indemnity). *Yemen, supra,* 782 F.2d at 351. *See also Zapico v. Bucyrus–Erie Co.,* 579 F.2d 714, 718 (2d Cir.1978); *SSDW Co. v. Feldman–Misthopoulos Assoc.,* 151 A.D.2d 293, 295–96, 542 N.Y.S.2d 565, 567 (1st Dep't.1989).

In *Yemen, supra,* plaintiff, a purchaser of grain, brought suit against the seller to recover detention, deadfreight and carrying charges incurred in relation to the parties' contract for the sale and shipment of grain. Plaintiff alleged an implied right of indemnification based on the contractual relationship between the parties. Plaintiff recovered on the indemnity theory, but on appeal the Second Circuit reversed, holding that

... there is nothing special about the contractual relationship between [a grain seller] and [a grain buyer] that would warrant implying in fact a contract for indemnification. Their grain sale agreements were fairly ordinary commodities contracts. There is simply nothing in them or in the parties' dealings from which an agreement to indemnify "could fairly be implied".

*Id.* at 351 (quoting *Zapico*, 579 F.2d at 719).

Here, as in *Yemen*, there is nothing special about the contractual relationship between JCTC and CRS which would dictate the imposition of a right to "implied in fact" indemnification. CRS was a USDA Foreign Agricultural Service approved grain seller that contracted to provide rice to JCTC based on pro forma commodity contract provisions, and its obligations to JCTC are measured by their commodity contract. Any further agreement to be bound cannot fairly be implied. "If an implied contract for indemnification were to be found here, one would have to be found in nearly every commodities sale contract that lacked a clause excluding it, a result that would reverse all standard contract and indemnity law." *Id.* We refuse to go so far; accordingly, we conclude that there was no implied contract for indemnity within the JCTC–CRS commodity contract.

Similarly, JCTC has no "implied in law" indemnification right. Such indemnification is designed to shift responsibility from one joint tortfeasor to another for damages caused by the tortious acts of the other, a situation that is not present in the instant action. *Id.*

Based on the foregoing discussion, we are compelled to find that CRS is not liable to JCTC on either an express or implied indemnity theory. "Such a claim—for consequential damages resulting from [an alleged failure to deliver the goods according to contract specifications]—is one for breach of contract, not for indemnity." *Id.* at 350. Accordingly, any damages award-ed in this case must rest upon principles of breach of contract.[5]

*Breach of Contract*

### 1. The Ambiguous Commodity Contract Terms

 The critical issue for our resolution is whether the terms "Port(s)" and "Lot" as contained in the commodity contract are ambiguous. JCTC contends that the term "Port(s)" is ambiguous in that it is unclear whether the term gives CRS the right to elect five or ten ports for each lot, the right to elect only one port per lot but two ports per delivery period, or the right to elect one of many Gulf ports. Plaintiff's Post–Trial Memorandum ("Plaintiff's Memo") at 57. CRS argues that the term "Port(s)" is unambiguous in that it means one or more ports, and when read in conjunction with the IFB provision "one safe port for each lot offered," it provides a clear indication of the intentions of the parties to allow for one loadport per lot offered. Defendant's Reply at 21.

"Contract language is ambiguous if it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract alone." *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990). The commodity contract is made up of the IFB, with incorporated pro forma terms, and the offer from CRS. The IFB states the amount of rice desired per delivery period (approximately 5000 MT), the dates of the three delivery periods, and the delivery terms, "F.A.S. vessel(s) at U.S. Port of Export from one safe berth, one safe port for each lot offered." (Ex. 7) The incorporated pro forma terms, referred to in the IFB as the "[f]ull details of terms and conditions," (Ex. 7) states delivery terms, "at one safe berth, one U.S. port." *Id.* The offer from CRS is for two lots of approximately 3,000 MT per delivery period, for a total of six lots offered, with delivery terms "net FAS vessel(s) U.S.A. Gulf Port(s)." (Ex. 9, p. 4)

**5.** The parties dispute whether maritime jurisdiction also provides the basis for this action. However, we have found, and the parties agree, that jurisdiction is founded in diversity. Accordingly, we need not address that issue.

Reading the commodity contract as a whole to ascertain the intention of the parties, it is not at all clear whether the understanding was to give CRS the option to deliver to six ports, to one port for each of the six lots offered, or to three ports, one port for each of the three delivery periods, which could be considered "lots" from the language in the IFB, or, relying on the pro forma provision, "one safe berth, one U.S. port," to one port for all deliveries contemplated by the entire contract. It is equally uncertain as to whether that provision, "one safe berth, one U.S. port," means per lot, per delivery period, or per the contract period. Considered alone, the language used in the delivery provisions of the commodity contract is reasonably capable of more than one interpretation and is therefore ambiguous. *See Burger King, supra,* 893 F.2d at 527.

When the language of a contract is ambiguous, a court may look to parol evidence in order to help it ascertain the intentions of the parties. *Id.* Accordingly, since we cannot determine, keeping our inquiry within the commodity contract, which construction JCTC and CRS intended for the delivery provisions, we turn to parol evidence in order to ascertain their intent regarding the delivery provisions of the commodity contract. *Id.*

### 2. The Intent of the Parties Regarding the Delivery Provisions of the Commodity Contract

■ On the morning of June 15, 1984, Ronald Fettig spoke with Grover Connell, who clarified the offer from CRS to be for one loadport per delivery period. Only after that telephone conversation was the offer from CRS accepted. Even if this conversation differed in any way from the recollection of Mr. Fettig, there were numerous documented confirmations from June 18, 1984 through August 10, 1984, which unequivocally demonstrated the intention of both JCTC and CRS that the delivery of the rice was to be to one port for each of the three delivery periods.

On June 18, 1984, F & D sent CRS a telex confirming the terms of the sale. It stated that the rice was to be delivered to "one safe port only" for lots 1 and 2 (delivery period 1), "one safe port only" for lot 3 (delivery period 2), and "one safe port only" for lots 4 and 5 (delivery period 3). (Ex. 18) CRS never communicated any objection to the telex or its contents to F & D.

On June 28, 1984, after CRS nominated two loadports for the first delivery period, F & D responded, "[p]er contract the subj[ect] cargo is to be delivered at one [loadport] only ... please nominate sole loadport." (Ex. 34) Again, CRS made no objection to the telex, or to the assertion that one loadport per delivery was "per contract." In fact, the response by CRS on July 2, 1984, confirmed what JCTC contends, to wit, the intent of the parties was to have the rice delivered to one loadport per delivery position: CRS nominated Lake Charles, Houston and Orange to be the sole loadports for the first, second and third delivery periods, respectively. (Ex. 36) A contract becomes, by virtue of the nomination of a loadport, an agreement to deliver the goods to that loadport. *Stoomvart Maatschaffy Nederlandsche Lloyd v. Lind,* 170 F. 918, 919 (2d Cir.1909). Mr. Ravener, Vice–President for Traffic of CRS, was aware of the importance and finality of the nomination:

Q. Isn't it true ... when you nominated the port of Orange, you locked [CRS] to that port as the port of loading, unless you had some legal excuse under the contract to change?

A. Correct.

(Tr. 429)

On July 5, 1984, F & D sent CRS the Bagged Rice Contract, which included the pro forma terms and the terms specific to the agreement between the parties for this particular sale. The contract included delivery terms in clause V(A) which provided that for each delivery period, "[s]eller shall deliver ... at one safe U.S. port." Clause XVI(3) provided: "seller to make commodity available at not more than one port per delivery position." (Ex. 20) The clause "per delivery position" was not included in the IFB and pro forma contract that had been sent to CRS for the purpose of solicit-

ing a bid. The addition of that language does nothing to change the terms of the contract; it merely makes clause XVI(3) conform to the delivery terms as contained in other sections of the IFB and pro forma contract. Mr. Ravener reviewed the contract, but never communicated any objection to F & D.

Apparently interpreting the contract to state that each delivery was to be made at only one loadport, CRS supplied all the rice for the first delivery period to Lake Charles as the sole loadport, and all the rice for the second delivery period to Houston as the sole loadport.

On August 7, 1984, F & D sent the required reconfirmation notice to CRS, asking CRS to "nominate the sole loadport" for the third delivery period. (Ex. 38) On August 9, 1984, Mr. Ravener confirmed that Orange would be the sole loadport for the third delivery period; on August 10, 1984, F & D sent a telex to CRS, confirming Mr. Ravener's telephone confirmation. (Ex. 40) No objections to either telex were ever communicated to F & D, and CRS never voiced any contrary intent during the course of the contract.

CRS initially introduced its interpretation of the authority conferred by clause XVI(4) when it sent a telex to F & D on August 24, 1984 (Ex. 48, p. 11–12), during the time the rice was being loaded at Orange. The vessel Good Pioneer had arrived on August 20, 1984, and had commenced loading on August 22, 1984. Although CRS had known that there was insufficient rice at Orange for the delivery since July 2, it did not inform JCTC until sometime between August 18 and 22 or 23, 1984. Previous to that, on August 16, 1984, CRS had confirmed that all the rice would be at Orange when F & D contacted it after hearing rumors that all the rice was not available at Orange. (Tr. 123) CRS had not previously raised the supposed authority of clause XVI(4); in fact, it is questionable that the experienced management of CRS believed prior to August 24, 1984 that clause XVI(4) gave any authority for having over half of the allotted rice at Lake Charles. Mr. Ravener testified that Mr.

Purcell, in-house counsel to CRS, advised him that clause XVI(4) could be used to justify CRS's refusal to make all of the rice available at Orange:

Q. Now, you indicated you participated in the preparation of this telex [Ex. 48 p. 11–12]?

A. Yes.

Q. And Mr. Purcell also?

A. Most likely.

Q. What is the basis for you're saying "most likely?"

A. Because he's our in-house legal counsel.

Q. And he came up with the idea of using this clause [XVI(4) ]?

A. I don't know whether it was an idea, but he came up with using this.

(Tr. 393)

After a thorough analysis of the aforementioned communications and the trial testimony pertaining thereto, we have no hesitancy in finding that the intent of the parties was for an agreement for one loadport per delivery period. Any objections to the communications sent by F & D, which may have been raised internally within CRS, were never communicated to F & D, JCTC, or the USDA. JCTC, therefore, could not have had any indication that CRS had any objections to, or disagreement with, any of the communications, and we will not require it to know the internal communications of another company which had not been communicated to it. The communications of CRS all indicated an acceptance of an agreement for one loadport per delivery period.

The question now, given the agreement of the parties for delivery to one loadport per delivery period, is whether CRS had the contractual ability to nominate an additional loadport, thereby allowing it to deliver the rice to two loadports in the third delivery period. CRS maintains that clause XVI(4) of the commodity contract gave it the right to nominate a second loadport if scheduling necessitated; alternatively, it argues that the clause is ambiguous and therefore must be construed against its maker, JCTC. Defendant's Memo at 60–61. JCTC maintains that clause XVI(4) is

unambiguous, and in no way gave CRS the right to nominate an additional loadport. It argues that clause XVI(4) is a proviso regarding the substitution of one loadport for another should seller's scheduling necessitate it. Plaintiff's Reply at 36–38.

Clause XVI(4) provided:

In the event Seller amends or changes their original port nominations in order to satisfy Seller's own scheduling and for Seller's own benefit, then Seller is obligated to pay vessel's deviation, and additional cost and resulting demurrage, if any, occasioned by second port nomination, and to waive carrying charges resulting from delay in loading attributed to changed nomination of original port.

(Ex. 20)

CRS, relying on the terms "occasioned by second port nomination," claims that the plain language of clause XVI(4) permitted it to nominate a second loadport. Defendant's Reply at 27. We disagree.

"Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.1990). The language of clause XVI(4) is clear and unambiguous; it contemplates the amendment or change of an *"original port nomination."* (emphasis ours). It does not support the argument of CRS. There is a difference between changing an original port nomination and adding an additional port: changing an original port nomination involves substituting one specific port for another specific port. Mr. Ravener of CRS testified that he realized the difference and the consequences of making a nomination under each circumstance. (Tr. 396–97) This clause contemplates a situation where CRS finds it cannot have the complete shipment of rice at Orange, but could have it at Lake Charles instead, and desires that the vessel change its course to Lake Charles before arriving at port in Orange. What CRS did amounted to adding an additional port.

Read as a part of the entire contract, it would be entirely inconsistent with the agreement of the parties—for one loadport per delivery period—to permit CRS to unilaterally add a second loadport. It had been made clear by communication after communication that the agreement was for one loadport per delivery period.

We note, too, that clause XVI(4) is located not in the delivery section of the contract, but in the damages section. Its purpose was to set forth the damages which would be recoverable should circumstances dictate the need to switch an original port nomination, as indicated in the delivery clause of the contract, to another port. It was intended to enunciate an independent delivery provision. CRS was confined to one loadport per delivery period, but clause XVI(4) provided a certain flexibility in that it gave CRS the authority to nominate a substitute port *in place of*, not in addition to, the original port nomination. CRS would then be bound by clause XVI(4) to pay for any and all costs occasioned by such a nomination.

Based on the evidence adduced at trial and the law applicable thereto, we are compelled to find that clause XVI(4) did not give CRS the right to deliver rice to more than one loadport during the third delivery period. No other bases for such a right have been raised; consequently, we find that CRS had a duty under the contract to deliver all of the rice for the third delivery period to Orange. Its failure to do so amounts to a breach of that duty; therefore, CRS is liable for the damages incurred by JCTC as a result of that breach.

## DAMAGES

■ As stated earlier, the parties intended, as evidenced by their actions, that delivery was to be to one loadport per delivery position. Additionally, the nomination of one port per delivery period by CRS in its July 2, 1984 telex to F & D (Ex. 36) served to lock CRS into delivering the rice to those specified ports as if those port nominations had been written into the original contract. The failure of CRS to deliver the full amount of rice to Orange for the third delivery position constituted a breach of the parties' contract; accordingly, JCTC is entitled to recover all reasonably certain damages which flowed from that breach.

*Vitol Trading S.A., Inc. v. SGS Control Svcs., Inc.,* 874 F.2d 76, 79 (2d Cir.1989).

JCTC argues that as a result of its breach of contract, CRS is responsible for the following damages:

| | |
|---|---|
| Demurrage | $ 39,779.49 |
| Second port call | 50,000.00 |
| Legal fees (re: CRS's arrest of the vessel at Beaumont) | 1,020.00 |
| Interest awarded to Panama by arbitrator | 16,724.46 |
| JCTC– Panama arbitrator fee | 1,600.00 |
| Attorney's fees re: defense of Panama arbitration claim | 14,482.95 |
| | $123,606.90 |

Plaintiff's Reply at 41; *see also* Ex. 55–66, 99, 103.

CRS argues that the measure of its liability does not exceed $6,500.00. This argument, which is the only argument raised by CRS regarding its liability for damages, is based on its claim that since it had the right to nominate an additional loadport under clause XVI(4), any damages stemming from that nomination are limited by those provisions. Since we have previously found that 1) clause XVI(4) does not apply to additional port nominations, but only to substituted port nominations, and 2) the nomination by CRS was for an additional port, the damage provisions of clause XVI(4) are inapplicable and will not be relied on. Regarding damages, the commodity contract provides:

> Seller to be responsible for all damages sustained by Buyer due to Seller's failure to perform the terms and conditions of this contract, including without limitation the following:
>
> . . . .
>
> All costs and expenses incurred by buyer resulting from detention or demurrage incurred ... for failure of Seller to ... maintain continuity of delivery....
>
> . . . .
>
> Seller guarantees to deliver cargo at vessel['']s call. Demurrage, if incurred by

the failure to do so, to be paid by Seller. . . .

(Ex. 20)

The demurrage charges of $39,779.49 and second port call costs of $50,000.00, sustained by JCTC, are those involving costs to, and movement of, the vessel necessitated by the inability of the seller, CRS, to provide the entire cargo at the vessel's call in Orange. That is precisely the class of harms for which the damage provisions of the commodity contract provided. The amount for the second port call, $50,000.00, was found reasonable by the arbitrator in the proceeding between JCTC and Panama, and is supported by the trial testimony of Mr. Fettig (Tr. 134–37). We find no reason to disturb it. Furthermore, the $16,724.46 in interest awarded by the arbitrator to Panama, once awarded, became part of JCTC's fixed damages and are thus recoverable. *DANAOS, supra,* 845 F.2d at 1165.

Finally, the general rule in New York is that the legal expenses incurred in maintaining or defending an action cannot be recovered as general or special damages. *Central Trust Co., Rochester, N.Y. v. Goldman,* 70 A.D.2d 767, 767–68, 417 N.Y. S.2d 359, 361 (4th Dep't.), *appeal dismissed* 47 N.Y.2d 1008, 420 N.Y.S.2d 221, 394 N.E.2d 290 (1979). However, "[w]here a breach of contract has caused a party to maintain a suit against a third person, courts have permitted recovery from the breaching party of counsel fees and other litigation expenses incurred in the suit." *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 309 (2d Cir.1987); *see also Artvale, Inc. v. Rugby Fabrics Corp.,* 232 F.Supp. 814, 826 (S.D.N.Y.1964), *aff'd,* 363 F.2d 1002 (2d Cir.1966); *In re Emergency Beacon Corp.,* 48 B.R. 341, 351 (S.D. N.Y.1985) and cases cited therein. The breach by CRS directly caused the arbitration action between Panama and JCTC; accordingly, JCTC is entitled to its attorney's fees and other expenses, in the amount of $16,082.95, that JCTC incurred as a result of its defense of the arbitration action brought by Panama. However, the $1,020.00 in legal fees incurred by JCTC with respect to the arrest of the vessel at

Beaumont are not recoverable because they do not fall within the above-mentioned exception. *Id.* Therefore, we find CRS liable to JCTC for $122,586.90, together with interest from December 23, 1986 to the date of judgment.

## CONCLUSION

Based on the total trial record and the law applicable thereto, we find in favor of plaintiff JCTC and against defendant CRS on the ground that CRS breached its duty under the commodity contract by failing to provide the entire amount of rice for uninterrupted loading at the port of Orange during the third delivery period. Consequently, we award JCTC damages in the amount of $122,586.90 plus interest at the current statutory rate from December 23, 1986 to the date of judgment. Parties shall bear their own costs. The clerk is directed to enter judgment accordingly.

SO ORDERED.